[Crim. No. 29787. Second Dist., Div. Five. Aug. 31, 1977.]

In re RAYFORD ANDERSON on Habeas Corpus.

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Robert R. Anderson, Deputy Attorneys General, for Appellant.

Wilbur F. Littlefield, Public Defender, Harold E. Shabo, Terry Kohl and Leighton A. Nugent, Deputy Public Defenders, for Respondent.

**OPINION**

**STEPHENS, Acting P. J.**—The People appeal from an order entered in a habeas corpus proceeding requiring the Department of Health to hold a limited hearing before officially revoking respondent's status as an outpatient from Atascadero State Hospital.[1] Respondent had been admitted to Atascadero on November 24, 1972 under the provisions of Penal Code section 1026 following his acquittal on an insanity plea. On May 5, 1975, he was placed on outpatient status, but 10 months later was

---

[1]The superior court order dated October 20, 1976 states: "The Petitioner is to be afforded a parole revocation hearing by the Department of Health within a reasonable time, which shall include the following due process procedures: (1) Written notice of the claimed violations of parole (2) Disclosure to the parolee of evidence against him (3) Opportunity to be heard in person and to present witnesses and documentary evidence (4) The right to confront and cross-examine adverse witnesses."

summarily returned on the initiative of local mental health personnel. On September 7, 1976, he instituted habeas corpus proceedings in the Superior Court, and then appealed the superior court order of October 20, 1976. Subsequently, on December 17, 1976, he sought further habeas corpus relief in this court, and this petition was granted only to the extent that we ordered that respondent be afforded counsel at his revocation hearing. (*In re Anderson* (Jan. 13, 1977), 2d Crim. No. 29725.)[2] The issue now before us is whether the procedural due process principles enunciated in *Morrissey* v. *Brewer,* 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593] and in *In re Bye,* 12 Cal.3d 96 [115 Cal.Rptr. 382, 524 P.2d 854] dictate that a mental patient acquitted by reason of insanity must be afforded notice and a hearing prior to the revocation of his outpatient status. We conclude in the affirmative.

Section 7375 of the Welfare and Institutions Code governs the outpatient treatment of those committed to a state mental hospital after acquittal on grounds of insanity. Subdivisions (d)(1) through (d)(4) of that section (added Stats. 1975, ch. 1274, § 22) establish the following procedures: First, before a patient may be released for local outpatient care, treatment arrangements must be made with a county mental health facility; the committing court, the prosecuting attorney, and the patient's attorney must be notified, and formal court approval must be secured at the behest of the prosecuting attorney. (Subd. (d)(1).) Second, once the patient is placed on outpatient status, the designated outpatient supervisor is required to submit progress reports every three months to the court, the state hospital, and the local mental health facility. (*Id.*) Such status lasts for a one-year period, but is renewable for additional one-year terms. (*Id.*)Despite these elaborate release procedures, however, the patient is subject to summary return if the outpatient supervisor and the head of the local mental health facility are of the opinion that "the person refuses to accept outpatient treatment, or requires inpatient treatment." (Subd. (d)(3).) By contrast, if the prosecuting attorney seeks the patient's return (on grounds of his dangerousness to others), a full judicial hearing must first be held. (Subd. (d)(4). See generally, *Review of Selected 1975 California Legislation,* 7 Pacific L.J. 237, 407.)[3]

---

[2] The petition asked that respondent be given a *Morrissey* in-community preliminary hearing and a full judicial revocation hearing, in addition to a right to counsel.

[3] The pertinent portions of section 7375 read as follows: "(1) If the medical director of the state hospital or other facility is of the opinion that a person who has been committed to the state hospital or other facility pursuant to Section 1026 of the Penal Code has improved to such an extent that he is no longer a danger to the health and safety of

The People seek to justify the summary return procedure embodied in section 7375 on due process grounds, asserting that the state interest in providing proper, uninterrupted treatment for the protection of both patient and public "outweighs" any deprivation to the patient when he is returned to the hospital, and that the provision for habeas corpus relief provides an adequate buffer against arbitrary state action. Throughout this argument, the People attempt to circumvent the due process dictates of *Morrissey* (for revocation of parole) and *Bye* (for revocation of the outpatient status of a person committed to the California Rehabilitation Center (CRC) under the civil addict program), by urging that the

others while on outpatient treatment and will benefit from outpatient treatment, the medical director may allow the person to be treated as an outpatient. [¶] An announcement of intent to place the person on outpatient status shall be filed with the court of commitment, the prosecuting attorney, and attorney of record for the person at least 15 days in advance of the change in status. The court may hold a hearing and (1) approve or disapprove of the plan or (2) take no action, in which case the plan shall be deemed approved. The court shall transmit a copy of its order to the county mental health director or his designee. At the request of the prosecuting attorney, a hearing shall be held. Prior to filing such announcement of intent the medical director shall obtain the agreement of the county mental health director, the person in charge of a mental health facility and the person who has been recommended for outpatient treatment, that the person will receive and submit to outpatient treatment and that the person in charge of the facility will designate a person to be the outpatient supervisor of the person. At 90-day intervals following the beginning of outpatient treatment, the outpatient supervisor shall make a report in writing to the court, the state hospital . . . and to the person in charge of the mental health facility setting forth the status and progress of the person. The maximum period of such treatment shall not exceed one year. The court may at the end of such maximum period renew its approval for additional outpatient treatment upon the recommendation of the medical director of the state hospital or facility. The court shall communicate such renewal to the county mental health director or his designee. . . . [¶] (3) If at any time during an outpatient treatment period the outpatient supervisor is of the opinion that the person refuses to accept outpatient treatment, or requires inpatient treatment, he shall communicate such opinion or refusal to the person in charge of the facility. If the person in charge of the facility concurs, the person shall be returned to the state hospital or other facility to which he was committed . . . . The person in charge of the facility shall notify the county mental health director or his designee of the person's return. Such return shall be reviewable by a writ of habeas corpus only. If a verified petition for a writ alleges on its face facts sufficient to justify relief, an order to show cause shall issue. . . . [¶] (4) If at any time during an outpatient treatment period the prosecuting attorney is of the opinion that the person is a danger to the health and safety of others while on outpatient treatment, he may petition the court for a hearing to determine whether the person shall be continued on outpatient treatment. The court shall use the same standards as used in conducting probation revocation hearings pursuant to Section 1203.2 of the Penal Code. Upon receipt of the petition, the court shall calendar the case for further proceedings and the clerk shall notify the person, outpatient supervisor, the county mental health director or his designee, and attorney of record for the person of the calendared date. . . . If, after a hearing in open court, the judge of the committing court determines that the person is a danger to the health and safety of others, he shall order the person returned to the state hospital . . . . The court shall transmit a copy of its order to the county mental health director or his designee. Such order shall be reviewable by a writ of habeas corpus only."

decision to recommit a mentally disturbed offender, as opposed to a parolee or a narcotics addict, is made upon predominantly medical and not factual grounds. We reach the unescapable conclusion, however, that the conditional liberty interest of the outpatient from a mental hospital is no less entitled to due process safeguards than that of either the parolee or the outpatient from the California Rehabilitation Center (CRC). While the full panoply of protections contained in *Morrissey,* may not be appropriate in this context, the requirements outlined in *Bye* are the constitutional minima.

## DISCUSSION

The two-step methodology, settled on in *Morrissey* (408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593]) and followed in *Bye* (12 Cal.3d 96, 100) establishes the analytical framework to be used here—that is, first, whether the individual's interest is comprehended within the liberty or property language of the Fourteenth Amendment, and second, if some process is due, the scope of the necessary safeguards.

## I

██ We begin with the root proposition that it is the *nature* of the individual interest at stake and not its *weight* which triggers Fourteenth Amendment protections. (*Morrissey* v. *Brewer, supra,* at p. 481 [33 L.Ed.2d at p. 494]; *Board of Regents* v. *Roth,* 408 U.S. 564, 570-571 [33 L.Ed.2d 548, 556-557, 92 S.Ct. 2701]; *In re Bye, supra,* at p. 101.) ██ If an individual is condemned to suffer a "grievous loss" of liberty, he must first be accorded due process of law (see *Morrissey* v. *Brewer, supra,* at p. 481 [33 L.Ed.2d at p. 494]) irrespective of the burden imposed upon the government agency (see *Fuentes* v. *Shevin,* 407 U.S. 67, 91, fn. 22 [31 L.Ed.2d 556, 576, 92 S.Ct. 1983]). Following *Morrissey* guidelines, the *Bye* court determined that a CRC outpatient was possessed of a liberty interest, which, though conditional, was entitled to Fourteenth Amendment protections. (12 Cal.3d at p. 103.) Similarly, we conclude that the conditional liberty interest of the mental outpatient, like that of the parolee and the CRC outpatient, includes many of the core values of unqualified liberty and cannot be terminated without due process of law.

Pursuant to the express provisions of section 7375, the mentally disturbed offender, whose condition has improved to the extent that he no longer poses a danger to the health and safety of others, may be released on outpatient status provided he agrees to submit to treatment

through a county mental health facility under the auspices of a designated outpatient supervisor. The clinical program prescribed will of course vary in nature and degree with the type of mental illness with which the individual is afflicted. The conditions imposed upon the outpatient may simply involve the taking of certain prescribed medication, or, in addition, extensive counseling, therapy, and observation at the local mental health clinic might be required. As long as the outpatient complies with the regimen meted out through his supervisor and suffers no deterioration in his condition, his conditional liberty will not be revoked. Despite the conditions imposed upon him, the outpatient is able to form "the other enduring attachments of normal life" (*Morrissey* v. *Brewer, supra,* at p. 482 [33 L.Ed.2d at p. 495]; *In re Bye, supra,* at p. 101) and enjoys "many of the core values of unqualified liberty" (*Morrissey* v. *Brewer, supra,* at p. 482 [33 L.Ed.2d at p. 495]). The revocation of his status and recommitment to a state mental hospital—an institution which often is little more than "a sanitary dungeon" (*People* v. *Burnick,* 14 Cal.3d 306, 319 [121 Cal.Rptr. 488, 535 P.2d 352])—certainly works a loss of liberty as grievous as that inflicted upon his parolee and narcotic addict counterparts. (See *Meisel* v. *Kremens* (E.D.Pa. 1975) 405 F.Supp. 1253. Compare *Dietrich* v. *Brooks* (1976) 27 Ore.App. 821 [558 P.2d 357].) By contrast, even those already in confinement have been deemed to have that quantum of liberty which is within the ambit of the Fourteenth Amendment. (See *Wolff* v. *McDonnell,* 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963] [revocation of a prisoner's "good time credit"]; *Holmes* v. *United States Bd. of Parole* (7th Cir. 1976) 541 F.2d 1243, *Cardaropoli* v. *Norton* (2d Cir. 1975) 523 F.2d 990 [attachment of restrictive "special offender" classification to prisoners]; *United States* ex rel. *Schuster* v. *Herold* (2d Cir. 1969) 410 F.2d 1071 [involuntary transfer of a prisoner to an institution for the criminally insane]; *Romero* v. *Schauer* (D.Colo. 1974) 386 F.Supp. 851, *Burchett* v. *Bower* (D.Ariz. 1973) 355 F.Supp. 1278 [involuntary transfer of a mental patient to a penitentiary]; *Negron* v. *Preiser* (S.D.N.Y. 1974) 382 F.Supp. 535 [involuntary transfer of mental patient to an isolation cell]; *People* ex rel. *Maisano* v. *Macaluso* (1975) 80 Misc.2d 728 [363 N.Y.S.2d 777] [involuntary recommitment of a drug addict in a "halfway house"].) It can no longer be doubted, therefore, that a mental outpatient recommitted to a state mental institution suffers a "massive curtailment of liberty" (*Humphrey* v. *Cady,* 405 U.S. 504, 509 [31 L.Ed.2d 394, 402, 92 S.Ct. 1048])—a deprivation which the state cannot accomplish without due process of law. (See *O'Connor* v. *Donaldson,* 422 U.S. 563, 580 [45 L.Ed.2d 396, 410, 95 S.Ct. 2486] (Burger, C. J., concurring); *Specht* v. *Patterson,* 386 U.S. 605, 608 [18 L.Ed.2d 326, 329, 87 S.Ct. 1209]; *Meisel*

v. *Kremens, supra,* at p. 1257; German & Singer, *Punishing the Not Guilty: Hospitalization of Persons Acquitted by Reason of Insanity* (1976) 29 Rutgers L.Rev. 1011, 1071-1073; Note, *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1385, fn. 55.)

To call the revocation of respondent's outpatient status a "medical" as opposed to a "factual" or "adversary" decision, or to label his status as a "continuing course of treatment" is simply a variation of the now discredited right-privilege distinction. (See *Morrissey* v. *Brewer, supra,* at p. 482 [33 L.Ed.2d at p. 494]; *Bell* v. *Burson,* 402 U.S. 535, 539 [29 L.Ed.2d 90, 94, 91 S.Ct. 1586]; Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law* (1968) 81 Harv.L.Rev. 1439.) By whatever name, his liberty is valuable, and its termination "calls for some orderly process, however informal." (*Morrissey* v. *Brewer, supra,* at p. 482 [33 L.Ed.2d at p. 494].)

Before declaring the summary revocation procedure contained in section 7375 unconstitutional, however, we turn to the People's contention that the provision for habeas corpus review by the recommitted outpatient passes constitutional muster. That provision reads: "[The] return shall be reviewable by a writ of habeas corpus only. If a verified petition for a writ alleges on its face facts sufficient to justify relief, an order to show cause shall issue."

■ The fundamental mandate of the Fourteenth Amendment is that a person be afforded notice and an opportunity to be heard *prior* to deprivation of a significant liberty or property interest. (See *Laing* v. *United States,* 423 U.S. 161, 186 [46 L.Ed.2d 416, 435, 96 S.Ct. 473] (Brennan, J., conc.).) A narrow exception to this requirement has been fashioned as to property interests (*Fuentes* v. *Shevin,* 407 U.S. 67, 90-92 [32 L.Ed.2d 556, 575-577, 92 S.Ct. 1983]) such that, in limited instances, " '[w]here *only property rights* are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate' " (*Mitchell* v. *W.T. Grant Co.,* 416 U.S. 600, 611 [40 L.Ed.2d 406, 416, 94 S.Ct. 1895]; *Phillips* v. *Commissioner,* 283 U.S. 589, 596-597 [75 L.Ed. 1289, 1296-1297, 51 S.Ct. 608]). Given the "transcending value" of a person's interest in liberty (*In re Winship,* 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068]; *Speiser* v. *Randall,* 357 U.S. 513, 525 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332]; see *People* v. *Olivas,* 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375]), however, the prior hearing

requirement cannot so readily be subverted with respect to liberty interests. (Cf. *In re Roger S.* (1977) 19 Cal.3d 655 [139 Cal.Rptr. 861, 566 P.2d 997].) As habeas corpus relief is an after-the fact determination of the propriety of confinement, it cannot be any stretch of the imagination operate as a constitutional substitute for a prior (prerevocation) hearing. (Cf. *Chin Yow* v. *United States,* 208 U.S. 8, 11-13 [52 L.Ed. 369, 369-370, 28 S.Ct. 201] [deportation case].) It is the state, in seeking deprivation of respondent's conditional liberty, which must reliably establish facts justifying its proposed action. (See *In re Roger S., supra.*) Moreover, review by way of a petition for habeas corpus is not mandatory (Witkin, Cal. Criminal Procedure (1963) §§ 811-813), and under the statutory language the patient's petition will be denied if he is unable to marshal "facts sufficient to justify relief." Without being apprised of the reasons behind his recommitment, the patient can hardly be assured of the meaningful review to which he is constitutionally entitled. (See *In re Podesto,* 15 Cal.3d 921, 937 [127 Cal.Rptr. 97, 544 P.2d 1297]; *In re Sturm,* 11 Cal.3d 258, 268-270 [113 Cal.Rptr. 361, 521 P.2d 97]. See also *People* v. *Youngs,* 23 Cal.App.3d 180, 183 [99 Cal.Rptr. 901].)

## II

We turn now to a consideration of what process is due. ▮ It is axiomatic that "due process is flexible and calls for such procedural protections as the particular situation demands. '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' *Cafeteria & Restaurant Workers Union* v. *McElroy,* 367 U.S. 886, 895." (*Morrissey* v. *Brewer, supra,* at p. 481 [33 L.Ed.2d at p. 494]. See also *In re Bye, supra,* at p. 103.) Given the posture of this case, we do not presume to embark upon an expostulation of the specific procedures called for; rather, we only attempt to identify those minimal procedures which must precede the revocation of the outpatient status of a person conditionally released from a mental hospital under section 7375.

In the *Bye* case, our supreme court determined that significant functional differences between the narcotic rehabilitation program and the parole system—primary among which was the medical nature of revocation decisions, and the need for prompt return of an addict who is in remission—rendered the in-community prerevocation hearing specified in *Morrissey* (408 U.S. 471, 485-487 [33 L.Ed.2d 484, 496-497])

inappropriate in the case of a CRC outpatient. We are of the view that the same reasoning obtains with respect to the mental outpatient.

Community treatment of a mental patient facilitates the patient's adjustment to community life and in many cases speeds restoration of his sanity as well as affording state institutional personnel the opportunity to make an informed decision as to the patient's suitability for absolute discharge. (See Welf. & Inst. Code, § 7375, subd. (c); German & Singer, *supra,* 29 Rutgers L.Rev. 1011, 1068; Farmer, The Rights of the Mentally Ill (1967) at p. 38. See Generally, *The Community Adjustment and Criminal Activity of the Baxstrom Patients: 1966-1970* (1972) 129 Am.J.Psych. 309; Quinsey et al., *Oak Ridge Patients: Prerelease Characteristics and Postrelease Adjustments* (1975) 3 J.Psych. & L. 63, 73.) Yet in some cases the patient may not be ready for such conditional release, may fail to adjust to community life, or may suffer a relapse in his mental condition unrelated to the rigors of community life. In each instance, there is a reasonable probability that the patient's condition may deteriorate, or that he may endanger the safety of others if he remains on outpatient status. (See Quinsey et al., *supra.*) As in the case of the CRC outpatient, the need for immediate recommitment is of paramount importance both for public and patient well-being, and the decision is peculiarly a medical one best made by a person well versed in the patient's case history. (See *In re Bye, supra,* at pp. 106-107.) Thus, unlike the parole setting, an in-community preliminary hearing to establish probable cause before a neutral hearing officer is inappropriate in this context. (*In re Bye, supra,* at p. 107. See also, *Pannell* v. *Jones,* 36 N.Y.2d 339 [368 N.Y.S.2d 467, 470-471, 329 N.E.2d 159] [revocation of drug addict's "aftercare" status].)

We do not mean to foreclose the necessity of a preliminary hearing where the outpatient's conduct is equivocal or is only tangentially related to his mental illness, when, for instance, he refuses to take certain prescribed medication. (See *In re Bye, supra,* at p. 106; *Pannell* v. *Jones, supra,* 368 N.Y.S.2d 467, 471.) Otherwise, the minimal notice and hearing requirements set forth in *Morrissey,* and followed in *Bye,* apply in the instant case—that is, (1) prompt written notice of the charges and evidence against the patient justifying recommitment, and notice of the right to challenge the allegations at a full revocation hearing; (2) a revocation hearing held by a neutral hearing body, such as the Department of Health, in which the patient has the right to have the evidence against him disclosed, to confront and cross-examine witnesses, and to have a written statement by the fact finder as to the reasons for

revoking his outpatient status. (See *Morrissey* v. *Brewer, supra,* at pp. 487-489 [33 L.Ed.2d at pp. 497-499]; *In re Bye, supra,* at pp. 109-110. See generally, Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L.Rev. 1267.) **(5, 6)** (See fn. 4.) To prevent the erosion of due process safeguards, the unitary hearing for patients in need of immediate psychiatric care must be held as soon as is reasonably possible following the patient's return to the hospital.[4] (See *In re Bye, supra,* at pp. 108-109; *People* v. *Vickers,* 8 Cal.3d 451, 459, fn. 8 [105 Cal.Rptr. 305, 503 P.2d 1313].)

Accordingly, we conclude that the court order mandating that respondent be provided a *Morrissey* type revocation hearing to be held by the Department of Health comports with the requirements of due process. Insofar as the language of section 7375 of the Welfare and Institutions Code excludes the required notice and hearing, it fails to pass constitutional scrutiny.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

---

[4] It would seem that the state's power to detain and treat the mentally disturbed patient pending a hearing would be coextensive with its emergency detention power under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5150 et seq.)