[Crim. Nos. 20330, 20331, 20332. Oct. 17, 1978.]

In re JAMES H. MOYE on Habeas Corpus.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz, Edward T. Fogel, Jr., and Robert R. Anderson, Deputy Attorneys General, for Appellant.

Wilbur F. Littlefield, Public Defender, Harold E. Shabo, Dennis A. Fischer, Terry Kohl and Leighton A. Nugent, Deputy Public Defenders, for Petitioner.

Paul Halvonik, State Public Defender, Gary S. Goodpaster, Chief Assistant State Public Defender, Richard E. Shapiro, Paul Fogel and Quin Denvir, Deputy State Public Defenders, as Amici Curiae on behalf of Petitioner.

## Opinion

**RICHARDSON, J.—** ██ In these consolidated cases only one issue is presented for our determination: May a person who is committed to the Department of Health following his acquittal of criminal charges because of insanity be held in the department's custody for a period in excess of the maximum term provided for the underlying offense of which he was charged and acquitted? (See Pen. Code, § 1026; all further statutory references are to that code, unless otherwise cited.) We have concluded that well established constitutional principles of equal protection require that the duration of institutional confinement of such persons cannot exceed the maximum term for the underlying offense, unless the People or other committing authority establish grounds for an extended commitment, as outlined below. After the expiration of such maximum term, as extended, if further confinement and treatment is sought the People must either proceed in accordance with the civil commitment provisions of the Lanterman-Petris-Short Act (hereafter LPS act) (Welf. & Inst. Code, § 5000 et seq.) or rely upon outpatient supervision.

In 1970 James H. Moye, defendant and petitioner herein (hereafter petitioner), was charged with felony hit and run driving, an offense then punishable by a maximum term of five years' imprisonment. (Former Veh. Code, § 20001.) During the period from August 1970 to January 1972, the criminal proceedings were suspended and petitioner, having been found incompetent to stand trial, was committed to Atascadero State Hospital. (§§ 1367, 1368.) In December 1971, he was certified as competent, and on January 3, 1972, criminal proceedings were resumed. Petitioner pleaded not guilty, and not guilty by reason of insanity; he waived a jury trial and stipulated that the cause might be submitted on the transcript of the preliminary examination. The court found him guilty of one count of hit and run driving, and also found that he was insane at the time of the offense and that he had not yet regained his sanity. Accordingly, the court suspended further criminal proceedings and ordered him committed to the Department of Mental Hygiene to be placed in a state hospital until his sanity had been restored. (See *id.,* § 1026.)

In August 1974, the Director of Atascadero State Hospital determined that petitioner's condition had improved, and he was ordered released on outpatient status. (See Welf. & Inst. Code, § 7375, subd. (c).) Subsequently, in July 1976, this status was terminated and he was returned to the hospital; on February 17, 1977, he was again released on outpatient

status. Both the People and petitioner here challenged certain trial court procedures concerning termination of petitioner's status as an outpatient. We conclude, however, that these issues have become moot following rendition of the decision in *In re Anderson* (1977) 73 Cal.App.3d 38 [140 Cal.Rptr. 546].

Petitioner now seeks habeas corpus relief to terminate the custody of the Department of Health over him, contending that he may not be held in either actual or constructive custody under section 1026 for a period in excess of the five-year maximum term prescribed for the underlying offense of which he was charged. Because petitioner presently remains within the department's constructive custody while on outpatient status, his recent release has not rendered this issue moot.

In evaluating petitioner's contention we briefly review the statutory procedures for the commitment and release of persons acquitted of a criminal offense on the ground of insanity. Under section 1026, the issue of defendant's guilt is determined prior to proceedings on the sanity issue. If a guilty verdict or plea is entered, then the sanity issue is decided. If defendant is found to have been insane when he committed the offense then, unless the court finds that he has fully recovered his sanity, the court must direct either that defendant be confined in a state hospital or other mental health facility, or that he undergo outpatient treatment. (The outpatient treatment procedures contained, in section 1026.1, and the parole and outpatient procedures contained in section 7375 of the Welfare and Institutions Code, are not presently before the court and need not be considered.)

Thereafter, under section 1026a, a person committed may apply for his release on the ground that his sanity has been restored. No hearing on such application is allowed until the person has been confined, or placed on outpatient status, for at least 90 days from the date of the commitment order. If the application is denied, a new application may be filed following the expiration of one year from the date of the last hearing. The section further provides that ". . . the burden of proving that his sanity has been restored shall be upon the applicant."

Petitioner does not challenge the validity of his initial commitment to state hospital, nor does he attack the constitutionality of section 1026a or its allocation of the burden of proof on the sanity issue. Instead, he contends that his commitment "became unconstitutional by virtue of its excessive duration." As noted above, it is petitioner's position that as soon as his commitment extended beyond the five-year maximum period of imprisonment under former Vehicle Code section 20001, the burden of

proof shifted to the People to demonstrate grounds for civil commitment under the LPS act.

Notwithstanding petitioner's concession that section 1026a is valid as applied to cases in which confinement for the maximum term of the underlying offense has not as yet terminated, we examine the issue. ■ Although section 1026a is silent regarding the appropriate standard for determining whether one's "sanity" has been restored, we have recently held that the proper test "is not whether the person committed is no longer legally insane, but whether he has improved to the extent that he is no longer a danger to the health and safety of others, including himself. [Citations.]" (*In re Franklin* (1972) 7 Cal.3d 126 at p. 145 [101 Cal.Rptr. 553, 496 P.2d 465].) Persons committed under section 1026 may discharge this burden by establishing "by a preponderance of the evidence, that they are no longer a danger to the health and safety of themselves or others." (*Id.,* at p. 148.) A jury hearing is available, if requested, on the issue of release. (*Id.,* pp. 148-149.)

In contrast, as noted in *Franklin,* in commitment and release situations other than those presented under sections 1026 and 1026a, "Presumably, the burden would be upon the person or agency applying for the initial commitment . . . to establish to the satisfaction of the court or jury that the facts which would justify commitment truly exist." (*Id.,* at p. 146; see, e.g., Welf. & Inst. Code, §§ 3050, 3051, 3106, 3108 [narcotics addicts], 5304 [persons dangerous to others], 6316, 6316.2, 6318, 6321 [mentally disordered sex offenders], 6500.1, 6509 [mentally retarded persons].)

Despite the foregoing differences in the allocation of the burden of proof, *Franklin* upheld section 1026a against an equal protection challenge. We first observed that "there seems to be no serious dispute among the authorities regarding the propriety of requiring one who has proved himself insane at the time of the offense to prove that he has recovered his sanity. [Citations.]" (7 Cal.3d at pp. 145-146.) Citing several cases from other states, we explained that by reason of the prior judicial determination of insanity, "persons acquitted by reason of insanity fall within a special class, thereby providing a rational basis for differences in the treatment afforded them. . . . [¶] [W]e agree with the Supreme Court of Maine, in *Chase* [*Chase* v. *Kearns* (Me. 1971) 278 A.2d 132], that 'The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as

distinguished from people civilly committed because of only potential danger.' (278 A.2d at p. 138.)" (7 Cal.3d at pp. 146-147; see also Note (1973) 24 Hastings L.J. 487, 509 [burden of proof allocation under Pen. Code, § 1026a is "another measure of the greater precautions surrounding the handling of persons acquitted by reason of insanity, in order that the public interest may be protected"].)

As previously indicated, petitioner does not challenge our holding in *Franklin* that the initial burden of proof properly may be imposed on persons acquitted as insane to prove their restoration to sanity. ■ Petitioner contends, however, that *Franklin* did not consider the problem herein presented, namely, whether equal protection principles require a shifting of that burden to the People at the time when confinement, actual or constructive, has exceeded the maximum term for the underlying offense. Confronting the issue in this case we have concluded that statutory developments since *Franklin* support petitioner's contention that persons in his class have been unfairly selected and required to face indefinite confinement until they can establish their own fitness for release.

A comparison of other forms of procedures reveals a striking disparity with sections 1026-1026a methods. Perhaps the most glaring example of inequality appears when we examine the treatment afforded mentally disordered sex offenders (MDSOs). MDSOs comprise a class of individuals quite similar to those, such as petitioner, who have been acquitted of a criminal offense by reason of insanity. Both classes, for example, involve persons who initially have been found to have committed a criminal act, but whose mental condition warrants a period of confinement for treatment in a state institution, in lieu of criminal punishment. Prior to 1977, a person adjudicated an MDSO could be committed to a state hospital or other treatment facility "for an indefinite period" (Welf. & Inst. Code, former §§ 6316, 6326), potentially for life. (See *People* v. *Burnick* (1975) 14 Cal.3d 306, 320-321 [121 Cal.Rptr. 488, 535 P.2d 352]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 358 [121 Cal.Rptr. 509, 535 P.2d 373].)

By reason of our *Burnick* and *Feagley* holdings, however, substantial doubt was cast on the validity of an indefinite commitment for MDSOs, at least as to those confined in a prison treatment facility, a disposition which, in those cases, we deemed penal in character. In *Feagley* we expressly held that ". . . the state may not involuntarily confine a civilly committed mentally disordered sex offender for an indefinite period in a

prison setting [i.e., in a state treatment facility located on prison grounds]." (14 Cal.3d at p. 376.) We explained in *Feagley* that if an MDSO appeared unamenable to treatment in a state hospital, he should be returned to the criminal courts for further proceedings on the underlying offense.

Although *Feagley* did not purport to invalidate indefinite commitment procedures for those MDSOs who are amenable to treatment in state hospital, nevertheless the Legislature has subsequently enacted new provisions which limit the duration of *all* MDSO commitments in a manner somewhat similar to that sought by petitioner for commitments under section 1026. In 1977, sections 6316.1 and 6316.2 were added to the Welfare and Institutions Code. Section 6316.1 provides that an MDSO may not be kept in "actual custody" for a period longer than the maximum term of commitment, defined in part as the "longest term of imprisonment which could have been imposed for the offense or offenses of which the defendant was convicted, . . ." including the upper term of the base offense and any enhancements and consecutive offenses. It is significant for our purposes to note that the term "actual custody" in section 6316.1 does not include any periods of outpatient supervision in determining the maximum period of confinement.

Section 6316.2 provides for a special extended commitment of one year beyond the maximum term of imprisonment following jury trial if it is found that the patient suffers from a mental disorder and, as a result thereof, "is predisposed to the commission of sexual offenses to such a degree that he presents a serious threat of substantial harm to the health and safety of others." (§ 6316.2, subd. (a)(2).) Additional one-year commitments are available, following similar annual hearings. (*Id.,* subd. (h).)

The foregoing provisions demonstrate the marked differences between the statutory commitment and release procedures applicable to MDSOs on the one hand and persons committed under section 1026 on the other. Yet, as we have noted the preconditions to both commitments are similar: the initial commitment follows commission of a criminal act and is based upon a finding of a mental disorder which might present a danger to others. The MDSO can be confined for only a limited period, measured by the maximum term for the underlying offense, unless thereafter the *People* (or other committing authority) can establish grounds for an extended commitment. In contrast, persons in petitioner's class face

indefinite, lifetime confinement unless *they* can prove that their sanity has been restored.

In addition to the present MDSO procedure, we further note a general and growing legislative pattern to preclude or minimize the risk of an indefinite commitment to state institutions by requiring periodic review and recommitment hearings in which the burden of proving the dangerousness of the commitee's condition is placed on the state. (See Welf. & Inst. Code, §§ 1800 [two-year extended commitment for Youth Authority wards deemed dangerous at the time of discharge], 3201 [three-year extended commitment for narcotics addicts not cured after seven-year initial commitment], 5304 [LPS act commitment of dangerous persons limited to ninety days, unless new threats or harm occur], 5361 [one-year commitment of gravely disabled persons, unless new petition for conservatorship filed], 6500.1 [one-year commitment for mentally retarded persons unless recommitment justified], 6514 [one-year commitment for developmentally disabled persons, unless recommitment justified].)

Moreover, several other statutory provisions limit or measure the duration of confinement or custody by reference to the maximum term of the underlying offense, similar to those new MDSO procedures previously mentioned. (See §§ 1370, subd. (c)(1), 1370.1, subd. (c)(1) [limited commitment of persons found incompetent to stand trial]; Welf. & Inst. Code, § 731 [limited commitment of Youth Authority wards]; § 1203.1 [limited period of probation].)

In summary, our research reveals that commitments under section 1026 represent the *sole* instance of a potential lifetime confinement, imposed without regard to the nature of the underlying offense or the maximum punishment prescribed for it, and without the additional protection of periodic review and recommitment hearings. Thus, disparity of treatment seems clearly to exist.

■ Because petitioner's personal liberty is at stake, the People concede that the applicable standard for measuring the validity of the statutory scheme now before us requires application of the strict scrutiny standard of equal protection analysis. Accordingly, the state must establish both that it has a "compelling interest" which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest. (E.g., *People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].) At the very least,

persons similarly situated must receive like treatment under the law. (See *In re Gary W.* (1971) 5 Cal.3d 296, 303-304 [96 Cal.Rptr. 1, 486 P.2d 1201].) As we have noted, by reason of their commission of a prior criminal act and the finding of a mental disorder justifying the initial commitment, persons committed as MDSOs are "similarly situated" with persons like petitioner.

We have concluded that the People have failed to justify the different treatment of the two classes of committed persons. The People suggest that MDSOs suffer from a more "limited" form of mental disorder (predisposition toward commission of *sexual* offenses) when compared with persons found to be insane under section 1026. It seems quite clear, however, that both classes of persons present equally substantial risks of harm. By statutory definition, an MDSO is a person "who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses *to such a degree that he is dangerous* to the health and safety of others." (Welf. & Inst. Code, § 6300, italics added.) Yet, despite their potential dangerousness, MDSOs must be released from confinement when the maximum term for their underlying offense has expired, unless the People can establish grounds for an extended commitment. (*Id.,* § 6316.2.) We believe that constitutional demands of equal protection require a similar shifting of the burden of proof in favor of persons acquitted as insane, in order to retain them in confinement beyond the maximum term prescribed for the offense they committed while insane. (See *Waite* v. *Jacobs* (D.C.Cir. 1973) 475 F.2d 392, 396-399.)

The People contend that, unlike the situation in MDSO cases, here petitioner was *acquitted* of the offense charged, and that accordingly it would be wholly arbitrary to measure his term of confinement by reference to the punishment prescribed for an offense which he did not commit. As we have explained, however, under section 1026 the insanity finding follows a determination (by verdict or plea) that the accused committed the criminal act charged; an insanity finding establishes only that the accused was not criminally responsible for the offense he has committed. As in MDSO cases, subsequent confinement of the acquitted insane person is for purposes of *treatment,* not punishment. Nevertheless, in MDSO cases the Legislature has seen fit to provide that the period of actual confinement for treatment may not exceed the maximum period of punishment for the underlying offense, unless grounds for an extended commitment are shown. Similar protection must be accorded persons in petitioner's class.

Specifically, we hold that principles of equal protection require (subject to the availability of either an extended commitment as outlined below, or a civil commitment under the LPS act) that persons committed to a state institution following acquittal of a criminal offense on the ground of their insanity cannot be retained in institutional confinement beyond the maximum term of punishment for the underlying offense of which, but for their insanity, they would have been convicted. To the extent practicable, and in the absence of further legislation applicable to commitments under Penal Code section 1026, calculation of the maximum term of punishment should be made in accordance with the principles expressed in section 6316.1 of the Welfare and Institutions Code.

As in the case of MDSOs and other dangerous offenders, persons in petitioner's class properly, and consistent with equal protection principles, may be subjected to a period of extended commitment once the maximum term of punishment has expired, in the event the People (or other committing authority) can establish that the person committed remains a danger to the health and safety of himself or others. As noted above, for example, the commitment of MDSOs may be so extended only if a specified procedure is followed, involving the filing of a petition for an extended commitment of one year, notice to the person committed of his right to an attorney and a jury trial, and a hearing on the issue of dangerousness. (Welf. & Inst. Code, § 6316.2.) The extended commitment period is one year, subject to annual renewal following similar notice and hearing. (*Ibid.*) To the extent practicable, and in the absence of further legislation on the subject, the procedure for the extended commitment of persons committed following their acquittal on the ground of insanity should conform to the procedures specified in section 6316.2 of the Welfare and Institutions Code.

The People urge that the paramount interest of the state in protection of the public justifies the commitment and release procedure set forth in sections 1026 and 1026a. Nonetheless, the availability of an extended commitment procedure akin to section 6316.2 of the Welfare and Institutions Code, or the institution of civil commitment proceedings under the LPS act, would appear to constitute adequate protection against the premature release of dangerous persons to society. If, after a substantial period of confinement and treatment equivalent in duration to the maximum term for the offense committed, petitioner remains demonstrably dangerous, an additional commitment may be sought as discussed above. Although the burden of proof on the issue of dangerous-

ness will have shifted to the People once confinement for the maximum term of the underlying offense has occurred, upon a proper showing the petitioner may be retained in confinement and will not be "loose" or "at large."

It must be remembered that, except for their own plea of insanity, even the most dangerous of offenders are released to society upon serving their maximum term. Under such circumstances, the possibility of an indefinite, lifetime confinement provided by section 1026 may well deter from entering an insanity plea those very persons most in need of hospital treatment. Such a result serves neither the interest of the public nor those like petitioner who have entered insanity pleas.

The People's appeal in Crim. No. 20330, and petitioner's petition for habeas corpus in Crim. No. 20331, are both dismissed as moot. With respect to Crim. No. 20332, because the period of petitioner's actual confinement at Atascadero State Hospital has not yet exceeded five years, the order to show cause is discharged and the petition for habeas corpus is denied.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Manuel, J., and Newman, J., concurred.

Respondent's petition for a rehearing was denied November 15, 1978, and the opinion was modified to read as printed above.