Filed 7/21/16  P. v. Miller CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARK ALAN MILLER,<br><br>    Defendant and Appellant. | G051663<br><br>(Super. Ct. No. 06NF2222)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Reversed and remanded with directions.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

Mark Alan Miller appeals from an order extending his period of commitment to a state mental hospital as a mentally disordered offender (MDO), pursuant to Penal Code section 2972.[1] He contends the trial court violated his constitutional right to equal protection when it compelled him to testify at the trial to determine whether his commitment should be extended.

As Miller points out, the determination that a defendant qualifies as an MDO, and thus may be confined for treatment in a state mental hospital following the completion of his prison term, is similar to the determination that a person found not guilty of a crime by reason of insanity (NGI) should be confined in a state mental hospital for treatment past the maximum term of commitment for his or her crime. In the latter proceeding, however, the governing statute provides the defendant is "entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings" (§ 1026.5, subd. (b)(7)), which includes the right not to testify in the proceeding (*Hudec v. Superior Court* (2015) 60 Cal.4th 815, 819 (*Hudec*)). By contrast, when Miller objected to testifying in this MDO proceeding, the trial court rejected the assertion and required that he do so.

On appeal, the Attorney General makes several arguments in an attempt to explain why the Legislature's extension of the right not to testify to the persons facing extended commitments after being found NGI, but not to persons facing extended commitments as MDOs, is not a denial of equal protection. None of those arguments are persuasive, and we conclude that for purposes of asserting the defendant's right not to testify, these two groups are similarly situated. Nor are we persuaded by the Attorney General's initial attempt to justify the disparate treatment of these two groups. Thus, we reverse the judgment and remand the case to the trial court for an evidentiary hearing at which the prosecutor is given the opportunity to justify the disparate treatment.

---

[1] All further statutory references are to the Penal Code.

2

In 2008, Miller was convicted of two counts of second degree robbery. (§§ 211, 212.5, subd. (c).) In February 2010, Miller was found to be an MDO, and committed to a state hospital. In August 2014, the district attorney filed a petition to extend Miller's commitment for an additional year.

The trial was held in March 2015. Miller was called to testify by the district attorney, over his own objection. His testimony was relatively brief, spanning only 13 pages of the reporter's transcript. In his testimony he appeared cooperative and responded to the questions asked. However, he exhibited some irrational thinking, such as when he responded to the question: "After January of this year . . . did you want to stop taking your medication?" with the statement, "I had refused it a couple of times because of the numerators and denominators of the shell medication where the shells are psychotically proffinated to prenumeral identities." He was asked about his perception that people were spying on him, and he responded, "I do use the word 'spy,' but it's in a voluntary manner by people running around the street having scientifically modulated their car or something and maybe do white, black, red. Red being sadistically sinned, white meaning patrol officer, undercover narc." He then immediately acknowledged those things did not really happen, he just thinks they do.

Miller initially claimed he had not heard voices since he was "very little," perhaps seven or 15 years old, but later mentioned "hear[ing] voices, when I wake up at night, [that] make me want to go and — go back to prison."

Miller also gave inconsistent answers to the question of whether he planned to take his medications if released from the hospital, saying "yes" at one point, and then when asked again a moment later, saying, "I plead the Fifth." Although Miller admitted he suffers from schizophrenia and had been diagnosed as "antisocial," he twice refused to

3

acknowledge a relationship between his mental illness and his tendency to do things that get him into trouble.

Other than Miller, the only witnesses at the trial were two psychologists. The first one, Brandi Mathews, was a forensic psychologist employed at Atascadero State Hospital. Rather than treat patients, her sole duty was to complete reports for the court and provide expert testimony. She last completed a report on Miller in July 2014, diagnosing him with schizophrenia. She did not talk to Miller personally in connection with preparing that report, although she had "talked to him previously." She also spoke with Miller's treating psychologist. When asked if she had "looked further into more recent records" since completing that July 2014 report, Mathews said "yes," although she was not asked to specify what records she had looked into.

Mathews also observed Miller's testimony in court and was asked to opine whether "his presentation in court is consistent with . . . the diagnosis of schizophrenia." She responded, "Yes." She was also asked if there were "anything that he said or the way that he . . . behaved, that makes you think that he does not have or no longer has schizophrenia." She answered, "No." She was specifically asked "about how schizophrenia in Mr. Miller has manifested itself," including whether he had exhibited "nonsensical speech." She responded, "Yes. That is often a frequent documentation in this chart is his level of disorganized thinking."

Mathews was also asked, based on her review of the records and her observation of Miller in court, whether it appeared his symptoms had lessened in severity and whether his schizophrenia was in remission. She answered "no" to both questions.

Mathews also testified that Miller had a history of violent incidents during his hospitalization, including two incidents at Atascadero State Hospital, one in 2011 and another in January 2015. She described only the most recent one, in which Miller self-reported to a staff member that he had gone into another patient's room and struck the sleeping patient in the head with a closed fist. When asked why he had done that, he

4

replied, "Voices." Mathews acknowledged, however, there was no evidence the alleged victim confirmed the incident. After that self-reported incident, Miller was "placed in room exclusion . . . ." Mathews stated that she believed he was dangerous to others "when symptomatic" and that because he continues to be symptomatic, "he continues to represent a substantial danger."

On cross-examination, Mathews acknowledged that no "risk assessment[]" tests — i.e., "tests . . . conduct[ed] to test for dangerousness in an individual" had been done on Miller in connection with evaluating whether his commitment should be extended. She also admitted those tests were "not difficult to perform." Mathews also conceded that "[p]rior to January [i.e. the self-reported incident], I would say" his current symtomology had been "manageable."

The second psychologist, Jennifer Bosch, worked full time for the County of Orange as a clinical psychologist. She also maintained a private practice, where she conducted forensic evaluations as an appointed expert for the court, or as a hired expert for both prosecutors and defendants. She conducted an assessment of Miller in 2014, and an additional evaluation in February 2015. She stated he was "absolutely" better in 2015 than he had been in 2014. Like Mathews, Bosch opined that Miller suffered from schizophrenia, noting he had a history of hallucinations, of voices telling him what to do, and of nonsensical speech.

When Bosch interviewed Miller in February 2015, he told her he did not believe he was mentally ill and he did not believe he should be taking medication. He told her the only reason he was taking medication was so that he could be released.

In Bosch's opinion, Miller's records demonstrated a connection between his schizophrenia and his commission of violent acts. She did not have any information about the self-reported incident in January 2015, but noted he had yelled at another patient in December 2014, before being "redirected." That was her last notation of Miller

committing any violent act.  She expressed a belief that Miller represented a substantial danger of physical harm to others because his illness was not in remission.

On cross-examination, Bosch stated that she believed hitting someone in the back of the head, as Miller had reportedly done, would qualify as "a present danger of substantial physical harm," noting she assumed "there's probably records to indicate there's been, you know, concussions or damage — significant damage to a person's head when they are smacked on the back of the head."

The jury found Miller qualified as an MDO as alleged in the petition, and the court extended his commitment at Atascadero State Hospital.

DISCUSSION

*The MDO Proceeding*

As explained by our Supreme Court, the MDO statutory scheme provides that "[a]s a condition of parole, a prisoner may be designated and civilly committed as an MDO for involuntary treatment of a 'severe mental disorder' if certain conditions are met." (*People v. Allen* (2007) 42 Cal.4th 91, 99, fn. omitted.)  Specifically, the law "requires civil commitment of a state prisoner during and after parole when a chief psychiatrist of the Department of Corrections and Rehabilitation has certified that the prisoner suffers from a severe mental disorder that is not or cannot be kept in remission without treatment, that the disorder was one of the causes of or an aggravating factor in the prisoner's qualifying crime, that the prisoner has been in treatment for the disorder for at least 90 days within the year preceding release on parole, and that the prisoner represents a substantial danger of physical harm to others by reason of the disorder. [Citation.]  A prisoner may challenge the MDO certification by requesting a hearing before the Board of Parole Hearings . . . and, if unsuccessful, in superior court as to

6

whether the prisoner 'meets the criteria in Section 2962.'" (*People v. Harrison* (2013) 57 Cal.4th 1211, 1215.)

If the prisoner's severe mental disorder is not in remission near the end of the parole period, the district attorney may file a petition with the superior court to extend involuntary treatment for a period of one year. (§ 2970.) At trial on the petition, "'[t]he standard of proof shall be beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict.'" (*People v. Allen, supra*, 42 Cal.4th at p. 99; § 2972.)

*Fifth Amendment Claim*

Miller asserts the trial court's refusal to afford him the right not to testify in the MDO proceeding amounted to both a denial of his Fifth Amendment right not to testify against himself, and a denial of equal protection. We reject the Fifth Amendment argument because it is well-settled that although a proceeding to involuntarily commit a person for treatment affects his or her liberty interest, it is not criminal in nature. "[T]he MDO provisions are neither punitive in purpose nor effect and their procedural safeguards do not require us to transform the hearing into a criminal trial." *People v. Superior Court* (*Myers*) (1996) 50 Cal.App.4th 826, 834.) Instead, "'[t]he MDO Act has the dual purpose of protecting the public while treating severely mentally ill offenders.'" (*People v. Harrison, supra*, 57 Cal.4th at p. 1218.) Where the statutory scheme is not punitive in either purpose or effect, the Fifth Amendment is not implicated. (*Allen v. Illinois* (1986) 478 U.S. 364, 369.)

*Equal Protection Claim*

Miller's equal protection argument is more persuasive. He contends that as the subject of an MDO proceeding to extend his civil commitment, he is similarly situated to a person who is facing the extension of a term of civil confinement after being found NGI, and that the person found NGI would be afforded a statutory right not to

7

testify in connection with a proceeding to extend the commitment. Specifically, section 1026.5 provides that in a proceeding where the prosecutor seeks to extend the commitment of a person found to be NGI beyond the maximum term of confinement for the crime committed, "[t]he person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (*Id*., subd. (b)(7).) And as recently confirmed by our Supreme Court in *Hudec*, *supra*, 60 Cal.4th 815 those rights do include the right not to testify.

""""The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment."""" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 (*Cooley*); *People v. Guzman* (2005) 35 Cal.4th 577, 591.) Moreover, "[d]ecisions by [the California Supreme Court] and the United States Supreme Court . . . have [long] used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens." (*People v. McKee*, (2010) 47 Cal.4th 1172, 1199 (*McKee*).)

As explained in *Cooley*, the first issue to be addressed when an equal protection claim is made is whether the state has adopted a classification that affects two or more similarly situated persons or groups in an unequal manner. "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'" (*Cooley, supra*, 29 Cal.4th at p. 253.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

As Miller points out, a person facing commitment as an MDO is confronting the same denial of liberty as a person facing an extended commitment following completion of an initial term of confinement as an NGI — and for essentially the same reasons. In both situations, the district attorney is attempting to establish the defendant is a danger to society because of a psychiatric condition that requires treatment

8

in a locked facility for an additional period. In both cases, the purpose of the extended commitment is the same: To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders. (Cf. §§ 1026.5, subd. (b)(1), 2972, subd. (c).)

Moreover, the procedural protections given to the subjects of these proceedings are similar. In a proceeding to extend the commitment of a person found to be NGI, the subject is entitled to be represented by counsel and to have a jury trial (§ 1026.5, subd. (b)(3)) and is also given a blanket entitlement "to the rights guaranteed under the federal and State Constitutions for criminal proceedings" (*id*., subd. (b)(7)). And in a proceeding to extend an MDO commitment, the statute specifies various protections found in criminal proceedings — e.g., it places the burden of proof on the person or agency that certified the person as requiring further treatment under the relevant statute, and the burden of proof is beyond a reasonable doubt. Additionally, the rules of criminal discovery, as well as civil discovery, apply, the subject of the proceeding is entitled to be represented by an attorney and to a jury trial, and if the trial is by a jury, the jury must be unanimous in its verdict. (§ 2972, subd. (a).)

Miller also relies on *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*), a case decided in the wake of *Hudec* which addressed a similar equal protection claim grounded on the fact that a person found NGI could refuse to testify at the hearing to extend his or her commitment, but a person facing commitment as a sexually violent predator (SVP) was not entitled to that same right. (*Id*. at p. 720.) Relying on *McKee*, *supra*, 47 Cal.4th 1172, the *Curlee* court found that for purposes of assessing the necessity of their testimony at trial, a person alleged to be an SVP was similarly situated to a person facing an extended commitment after being found NGI, but then remanded the case to the trial court to allow the prosecutor an opportunity to justify the disparate treatment. (*Curlee*, at pp. 722-723.)

9

While acknowledging that persons found NGI and persons declared to be MDO would be similarly situated for some purposes, the Attorney General argues that is not always the case. Specifically, the Attorney General relies on *Jones v. United States* (1983) 463 U.S. 354 for the proposition that the United States Supreme Court has recognized that there are "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees." (*Id.* at p. 367.) However, the difference highlighted in that case is that a person who has been acquitted of a crime on the basis of insanity has himself "advance[d] insanity as a defense and prove[d] that his criminal act was a product of his mental illness" (*ibid.*), a distinction that justified affording those NGI acquittees *less* procedural protection than were afforded to other candidates for civil commitment. That distinction certainly does not help the Attorney General here, when the crux of Miller's argument is that those defendants who have advanced (and proved) insanity as a defense to their criminal charge are being afforded *greater* procedural protections than he is.

The Attorney General also points out that: (1) "In contrast to NGI's MDO's have been found guilty of a crime and are punished for that crime"; (2) "an NGI commitment may be extended for any felony [citation] while an MDO's crime must have been a serious or violent felony"; (3) "[a]n NGI recommitment is for a period of two years [citation] while an MDO commitment is for a period of one year"; and (4) "to extend an NGI commitment, the People need only prove the committee suffers from a mental illness [citation] while the People must prove an MDO committee suffered from a *severe* mental illness that is not in remission." And those are differences, to be sure. However, what the Attorney General fails to do is explain how those differences are material to the issue of compelled testimony at a proceeding to extend a civil commitment. We cannot see how they would be.

While it is true that a person found NGI was not "found guilty of a crime," that is only because of his or her impaired mental state at the time he or she *was found* to

have committed the relevant criminal act. And while all MDOs have committed serious or violent felony acts, the same is true of at least some persons found NGI — and they remain entitled to the protections of section 1026.5 for their commitment extension proceedings, without regard to the seriousness of their offenses. As to the Attorney General's third point, we are unaware of any rule that extends or curtails a person's testimonial privilege based on whether the period of involuntary confinement he or she faces would exceed one year. And finally, extended commitment under the NGI statute does not merely require proof of a "mental illness," it requires proof that by reason of the person's mental disease, they "represent[] a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) That is essentially the same standard employed in the MDO extension proceeding. (§ 2972, subd. (c) ["by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others"].)

In summary, the Attorney General has failed to proffer any persuasive argument as to why persons facing extended commitment as MDOs are not similarly situated to those persons previously found NGI, for purposes of being compelled to testify in the proceeding to determine whether their commitment should be extended. We conclude they are similarly situated, and consequently turn to the issue of whether the Legislature's disparate treatment of these two groups — by affording persons found NGI the right not to testify, while denying that same right to MDOs, is justified.

As explained in *McKee*, *supra*, 207 Cal.App.4th 1325, once the appellant demonstrates that two groups receiving different treatment are similarly situated, the burden shifts to the state to "establish[] it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose." (*Id*. at p. 1335.) As the Attorney General concedes, we apply strict scrutiny in assessing the claimed justification because the interest at stake in these proceedings is the appellant's *liberty* interest. "'[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" (*People v. Allen,*

11

*supra*, 42 Cal.4th at p. 98.)  That liberty interest is a fundamental one.  (See *In re Moye* (1978) 22 Cal.3d 457, 465 [explaining that "[b]ecause petitioner's personal liberty is at stake, . . . the applicable standard for measuring the validity of the [NGI] statutory scheme now before us [as distinguished from the mentally disordered sex offender scheme then in effect] requires application of the strict scrutiny standard of equal protection analysis"].)

Under the strict scrutiny standard, "the state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest."  (*In re Moye, supra*, 22 Cal.3d at p. 465; see also *McKee, supra*, 47 Cal.4th at p. 1208 [requiring the prosecutor to establish that disparate treatment "is needed to protect society"].)[2]

The Attorney General claims that disparate treatment is justified here because "MDO's have been found guilty of a serious or violent offense and NGI's are not criminally responsible for their offenses, which may or may not have been a serious or violent felony."  But the last part of that claim negates the first.  As we have already pointed out, the NGI statute affords the defendant the right to refuse testimony even if the original offense *was* a serious or violent one.  Thus, that factor cannot be used as a justification to deny the same right to MDOs.  That leaves only the fact that persons found NGI were not found criminally responsible for their offenses — and the Attorney General fails to explain how that might justify the disparate treatment in a proceeding which is intended to assess whether by virtue of the defendant's current mental illness, he or she represents a substantial danger of physical harm to others.

---

[2]        Very recently, the court in *People v. Dunley* (2016) 247 Cal.App.4th 1438 reached the same conclusions:  (1) NGIs and MDOs are similarly situated for purposes of the testimonial privilege (*id*. at p. 1450); (2) Strict scrutiny is the appropriate standard for evaluating whether the state has compelling interest by which to justify the disparate treatment (*id*. at p. 1453).

12

However, we also note, like the courts in *McKee* and *Curlee*, that the issue of justification for this disparate treatment was not actually litigated in the trial court. (*McKee, supra,* 47 Cal.4th at pp. 1208-1209; *Curlee*, *supra*, 237 Cal.App.4th at p. 722.) Moreover, like those courts, we cannot foreclose the possibility that the prosecutor would be able to demonstrate an appropriate justification if given the opportunity to do so on remand. Consequently, we conclude remand for that purpose is appropriate.

*The Attorney General's Claim of Harmless Error*

Finally, the Attorney General argues that even if it was a denial of equal protection for the court to compel Miller's testimony, that error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d. 818 — i.e., that it is not reasonably probable Miller would have obtained a more favorable result without his compelled testimony. Miller argues, however, that the proper standard for assessing harmless error here is the more stringent harmless "beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24.

In our view, *Chapman* provides the proper standard, given the substantial liberty issue at stake, and the constitutional violation at the heart of this issue. While the Attorney General seeks to portray the error as merely the denial of a *statutory* right not to testify, the error we have identified was the denial of Miller's right to equal protection under the federal Constitution.

In any event, the Attorney General asserts the error would be harmless under either standard "because ample evidence apart from [Miller's] own testimony established that [he] suffered from a severe mental illness, such illness was not in remission, and [he] represented a substantial danger of physical harm to others."

That is not the test. In assessing whether an error was harmless beyond a reasonable doubt under *Chapman*, "[t]he inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether

13

the guilty verdict actually rendered in *this* trial was *surely unattributable to the error*." (*People v Johnwell* (2004) 121 Cal.App.4th 1267, 1278, second italics added.) Where, as here, the claimed error was allowing the jury to rely on a defendant's own testimony as a basis for evaluating his mental state, that standard is difficult to meet. But the effect of that error was magnified in this case because the first psychologist, Mathews, was allowed to watch Miller testify before the jury, and then offer the jury her opinion based in part on that testimony. Additionally, it can be argued that the prosecutor's questioning of both psychologists was designed to highlight the behaviors Miller had displayed on the witness stand.

Thus, while Miller's testimony was relatively brief, it provided a foundation for the prosecutor's entire case, and gave credibility to both psychologists' opinions about him. That credibility was likely significant, because neither psychologist cited much evidence to support her opinion that Miller also posed significant danger of physical harm to others at the time of trial. Mathews described only the January 2015 incident in which Miller self-reported that he had struck another patient on the back of the head, even as she acknowledged that no other patient had apparently corroborated Miller's claim. And Bosch acknowledged she was aware of no violent incidents later than 2014, when Miller had merely yelled at another patient before being redirected. This evidence of danger, although sufficient to support a verdict, is thin. We could not say that in the absence of Miller's own testimony — which displayed his mental condition to the jury in rather stark terms — it is not reasonably probable the jury would have returned a different verdict at this trial. Hence, even if we were applying the *Watson* standard, we would reject the claim of harmless error.

14

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court for an evidentiary hearing to allow the prosecutor an opportunity to justify the disparate treatment between persons found NGI and persons facing extended commitment as MDOs when it comes to the right to refuse testimony at a hearing to extend their commitment. In conducting the hearing, the trial court shall apply the standards and rules articulated in *McKee*, *supra*, 47 Cal.4th at page 1210. If the prosecutor can provide an appropriate justification, which withstands strict scrutiny, for treating those similarly situated groups differently, then the trial court shall reissue the order extending Miller's commitment as an MDO. If the prosecutor does not carry that burden, the trial court shall conduct a new trial at which Miller is not required to testify.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

ARONSON, J.

15