Filed 11/25/13  P. v. Welch CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KENDYL WELCH,<br><br>Defendant and Appellant. | H039086<br>(Santa Clara County<br>Super. Ct. No. 211349) |

Appellant Kendyl Welch was committed to the custody of the Department of State Hospitals[1] for an indeterminate term in 2010, after a jury found him to be a "sexually violent predator" (SVP) within the meaning of the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.).[2]  This court rejected all but one of his challenges to the order of commitment and remanded the case "for the limited purpose of reconsidering Welch's equal protection claim in light of [*People v.*] *McKee* [(2010) 47 Cal.4th 1172 (*McKee I*)]" once the proceedings in that case became final.  (*People v. Welch* (Apr. 3, 2012, H035567) [nonpub. opn.] (*Welch I*).)  The California Supreme Court

---

[1]     The SVPA was amended effective June 27, 2012 to reflect that the Department of Mental Health is now the Department of State Hospitals (DSH).  (Stats. 2012, ch. 24, §§ 63, 65, 138-146, pp. 85, 117-124.)

[2]     Further statutory references are to the Welfare and Institutions Code unless otherwise noted.

denied Welch's petition for review. (*Welch I*, *supra*, review den. June 27, 2012, S202473.)

Meanwhile, the trial court on remand in *McKee I* held an evidentiary hearing on McKee's equal protection claim, rejected it, and committed him as an SVP. The Fourth District Court of Appeal affirmed, and the California Supreme Court denied review. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1347-1348 (*McKee II*), review den. Oct. 10, 2012, S204503.)

With the decision in *McKee II* final, the trial court committed Welch to the custody of the DSH "as previously ordered." Welch filed a timely notice of appeal from the trial court's November 9, 2012 order. He contends that (1) "*McKee II* is not binding on [him] because he is dissimilarly situated from McKee and is entitled to his own evidentiary hearing" and that (2) "the *McKee II* court incorrectly applied the law regarding the alleged equal protection violation." We affirm.

## I. Background

Since the facts of Welch's crimes are irrelevant to the issues he raises on appeal, we do not repeat them.

## II. Discussion
### A. The SVPA and Proposition 83

The SVPA provides for the involuntary civil commitment of persons found to be SVP's beyond a reasonable doubt at trial. (*People v. Williams* (2003) 31 Cal.4th 757, 764.) An SVP is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).)

2

The SVPA as originally enacted provided for a two-year commitment, renewable for successive terms if the People proved beyond a reasonable doubt at a new trial that the committed person remained an SVP. (Former § 6604, Stats. 1995, ch. 763, § 3.) There were two ways an SVP could obtain review of his or her current mental condition to determine if civil confinement was still necessary. (*People v. Cheek* (2001) 25 Cal.4th 894, 898 (*Cheek*).) Former section 6608 permitted the SVP to petition, without the concurrence of the DSH, for *conditional* release to a community treatment program. (*Cheek*, at p. 898.) Former section 6605, which called for an annual review of a committed SVP's mental status, provided a procedure that, with the concurrence of the DSH, could lead to *unconditional* release. (*Cheek*, at p. 898.)

The SVPA was amended in 2006 by Proposition 83. (*McKee I*, *supra*, 47 Cal.4th at p. 1183.) Among other modifications, "Proposition 83 also change[d] an SVP commitment from a two-year term to an indefinite commitment." (*McKee I*, at p. 1186.) Under the amended SVPA, "[a]n SVP can only be released conditionally or unconditionally if the [DSH] authorizes a petition for release and the state does not oppose it or fails to prove beyond a reasonable doubt that the individual still meets the definition of an SVP, or if the individual, petitioning the court on his own, is able to bear the burden of proving by a preponderance of the evidence that he is no longer an SVP. In other words, the method of petitioning the court for release and proving fitness to be released, which under the former Act had been the way an SVP could cut short his two-year commitment, now becomes the only means of being released from an indefinite commitment when the [DSH] does not support release." (*McKee I*, at pp. 1187-1188.)

## B. Equal Protection and the *McKee I* and *McKee II* Decisions

Both the federal and state Constitutions guarantee the right to equal protection of the laws. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) " ' " "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly

3

situated with respect to the legitimate purpose of the law receive like treatment.'" [Citation.] "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.]'" (*McKee I*, *supra*, 47 Cal.4th at pp. 1218-1219.)

In *McKee I*, the California Supreme Court held that SVP's, MDO's (Pen. Code, § 2960 et seq.), and NGI's (Pen. Code, § 1026 et seq.) are similarly situated. (*McKee I*, *supra*, 47 Cal.4th at pp. 1203, 1207.) The court also concluded that McKee's disparate treatment claim required application of the strict scrutiny standard. (*Id.* at pp. 1197-1198.) "Because neither the People nor the court below properly understood this burden," the *McKee I* court decided, the People would have an opportunity to make the appropriate showing on remand. (*Id.* at pp. 1207-1208.) "It must be shown that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id.* at p. 1208.) This could be shown in a variety of ways, the court explained, including by demonstrating that the "inherent nature of the SVP's mental disorder" makes recidivism by SVP's "significantly more likely" or that "SVP's pose a greater risk to a particularly vulnerable class of victims." (*Ibid.*) The court directed the People on remand "to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*Id.* at p. 1210.)

On remand, the trial court conducted a 21-day evidentiary hearing. (See *McKee II*, *supra*, 207 Cal.App.4th at p. 1330.) Experts testified that SVP's have a higher risk of recidivism, that victims of sexual offenses suffer "unique and, in general, greater trauma" than victims of nonsex offenses, and that SVP's "are significantly different from MDO's

4

and NGI's diagnostically and in treatment." (*Id.* at pp. 1340-1347.) Concluding that this justified the disparate treatment of SVP's, the trial court rejected McKee's equal protection claim. (*McKee II*, at p. 1330.)

The Court of Appeal reviewed the evidence de novo. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1347.) The court concluded that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). (*McKee [I]*, *supra*, 47 Cal.4th at p. 1207.) The People have shown that, 'notwithstanding the similarities between SVP's and MDO's [and NGI's], the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society.' (*Id.* at p. 1208.) The People have shown 'that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] . . . that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children'; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate that passed Proposition 83 that the disparate treatment of SVP's under the amended Act is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered. [Citation.]" (*McKee II*, at p. 1347.)

### C. Welch's Contentions

Welch contends that the *McKee II* court's findings and conclusions bind only McKee. He maintains that he has a due process right to present evidence and to argue at trial that a life commitment cannot validly be imposed on him. We disagree.

Welch first argues that he and McKee are "dissimilarly situated" because his victims were adult women while McKee's victims were children. An argument based on

the same distinction was rejected in *People v. McKnight* (2012) 212 Cal.App.4th 860 (*McKnight*). We agree with the *McKnight* court that the analysis and holding in *McKee II* do not turn on concerns specific to child predators. (*McKnight*, at p. 863; see *McKee II*, *supra*, 207 Cal.App.4th at p. 1347 [stating multiple bases for the court's finding that SVP's as a class bear a substantially greater risk to society, which warrants imposing a greater burden on them before they can be released from commitment].)

Welch next argues that the California Supreme Court "did not purport to resolve definitively the constitutionality of the SVP law" but on the contrary "implicitly determined" in *McKee I* that an equal protection judgment must be made in each case on an as applied rather than a class basis. We disagree.

Other courts have rejected this argument, and properly so. (E.g., *McKnight*, *supra*, 212 Cal.App.4th at pp. 863-864; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378 (*McDonald*).) As the *McKnight* court explained, the *McKee I* court "recognized that the People could attempt to justify the Act's disparate impact in a variety of ways, and that these included showing that SVP's as a class are significantly more likely to reoffend than MDO's or NGI's, showing they pose a greater risk to children (in which case the equal protection analysis would apply only to child predators), or by other, unspecified means. [Citation.] In light of that recognition, the Court transferred the multiple 'grant and hold' cases under *McKee I,* including this one, to the Courts of Appeal with directions to vacate their prior opinions and suspend further proceedings until the *McKee I* remand proceedings were final, '*in order to avoid an unnecessary multiplicity of proceedings.*' [Citations.] On remand, *McKee [II]* concluded that differences between *SVP's as a class* and other offenders justify their different treatment under the Act. It is plain that *McKee II* is not to be restricted to [McKee] alone or only to those SVP's convicted of crimes against children . . . , but rather its holding applies to the class of SVP's as a whole." (*McKnight*, at pp. 863-864; accord, *McDonald*, at p. 1378.) We agree with the *McKnight* and *McDonald* courts' conclusion that the high court's

6

emphasis on classwide proof, together with its suspension of activity in grant-and-hold cases to avoid an unnecessary multiplicity of proceedings, demonstrates that it intended the equal protection challenge to the amended SVPA be resolved on a class basis in *McKee II*. (*McKnight*, at pp. 863-864; *McDonald*, at p. 1378.)

Welch next argues that the *McKee II* court improperly applied a deferential rather than a de novo standard of review, as evidenced by its discussion of the applicable standard, which "referred . . . three times to the 'substantial evidence' standard." We disagree.

A court applying the deferential substantial evidence standard of review " 'must view the evidence in a light most favorable to [the judgment] and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318-320.) That is not what the *McKee II* court did here.

Addressing the standard of review, *McKee II* court stated that "McKee asserts, and we agree, that we review *de novo* the trial court's determination whether the Act, as amended by Proposition 83, violates his equal protection rights. We *independently determine* whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the Act." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338, italics added.) The court rejected the People's argument that it should defer to the trial court's findings of historical fact and credibility determinations. (*Id*. at p. 1338, fn. 3.) Observing that "the trial court's statement of decision did not make any express findings regarding disputed historical facts or the credibility of certain witnesses," the court declared that it was "*in as good a position as the trial court* to decide whether the evidence presented by the People during the remand hearing satisfied their burden to justify the disparate treatment of SVP's under the Act." (*Ibid*., italics added.) The court ultimately agreed with the trial court that

7

the People had produced substantial evidence to justify the disparate treatment. (*Id.* at pp. 1330-1331.) The *McKee II* court's review was plainly de novo.

The *McKee II* court's statement that "[i]n independently reviewing the evidence admitted at the remand hearing, we must determine whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests" does not compel a contrary conclusion. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1339.) The quoted statement's reference to "substantial evidence" reflects nothing more than the *McKee II* court's adherence to the standard the high court directed it to follow. In *McKee I*, the high court explained that "[w]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body '"has drawn reasonable inferences based on substantial evidence."' [Citations.]" (*McKee I*, *supra*, 47 Cal.4th at pp. 1206-1207.) The *McKee II* court followed this standard.

Welch next complains that the *McKee II* court applied a rational basis rather than a strict scrutiny test. We disagree.

In *McKee I*, the high court directed the trial court to apply the equal protection principles articulated in *In re Moye* (1978) 22 Cal.3d 457 (*Moye*) and related cases discussed in *McKee I* to determine whether the People "can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*McKee I*, *supra*, 47 Cal.4th at pp. 1208-1209.) In *Moye*, which involved an equal protection challenge to a civil commitment statute, the high court articulated the strict scrutiny standard as follows: "[T]he state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest." (*Moye*, at p. 465.)

8

The *McKee II* court applied that standard. It independently reviewed the evidence and concluded that the People had shown that the legislative distinctions between classes of persons subject to civil commitment were reasonable and factually based. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.) Specifically, the People had shown that recidivism among SVP's as a class is more likely than among either MDO's or NGI's, that SVP's pose a greater risk to a particularly vulnerable class of victims, and that they have "significantly different diagnoses" and significantly different treatment plans, compliance, and success rates than MDO's and NGI's have. (*McKee II*, at p. 1347.) The court concluded that these distinctions justified disparate treatment, which was "necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered." (*Ibid*.) This satisfied the strict scrutiny standard.

Welch argues, however, that "[t]he portion of the opinion addressing the [trial court's] three factual findings does not use language indicating [that] 'the state has a compelling interest in treating the three classes differently.'" The argument lacks merit. The *McKee II* court expressly stated that the significant differences between the three classes "support[ed] a reasonable perception by the electorate . . . that the disparate treatment of SVP's under the amended Act is necessary *to further the state's compelling interests in public safety and humanely treating the mentally disordered*." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347, italics added.)

Welch also argues that strict scrutiny "requires an analysis of whether the different treatment of the classes is actually necessary." We disagree.

The People were not required to show that SVP's are *actually* more dangerous as a class. In remanding the case, the *McKee I* court stated that "the government will have an opportunity to justify Proposition 83's indefinite commitment provisions . . . , and demonstrate *that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate*. [¶] Moreover, we emphasize that mere disagreement among experts will not

suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial." (*McKee I*, *supra*, 47 Cal.4th at pp. 1210-1211, fn. omitted, italics added.) The *McKee II* court relied on evidence that scores on the Static-99 test, which assesses the risk that a sex offender will commit sex offenses, were significantly higher for SVP's than for MDO's and NGI's. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1342.) It complied with the high court's directions.

Welch next complains that the evidentiary hearing in *McKee II* improperly focused on evidence that was "irrelevant to a correct strict scrutiny analysis"—i.e., on evidence that lawmakers might have considered before enacting Proposition 83 and the amended SVPA. "The only evidence any court should have been reviewing," Welch asserts, "was that showing the actual intent of the voters who passed Proposition 83 and the [L]egislature that passed S.B. 1128." We disagree.

Welch's reliance on *Mississippi University for Women v. Hogan* (1982) 458 U.S. 718 (*MUW*) and *United States v. Virginia* (1996) 518 U.S. 515 (*Virginia*) is misplaced. Those cases stand for the proposition that parties seeking to defend *gender-based* government action must demonstrate an "exceedingly persuasive justification" for that action. (*MUW*, at pp. 728-730 [holding that university's female-only admissions policy, as applied to males seeking admission to the university's school of nursing, violated equal protection where, "although the State recited a 'benign, compensatory purpose,' it failed to establish that the alleged objective [wa]s the *actual purpose* underlying the discriminatory classification," italics added]; *Virginia*, at pp. 534-536 [noting that "[i]n cases of this genre, our precedent instructs that 'benign' justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe *actual state purposes*, not rationalizations for actions in fact differently grounded," and holding that the state had shown "no 'exceedingly persuasive

10

justification' for excluding all women from the citizen-soldier training afforded by VMI."
(Italics added)].)  *MUW* and *Virginia* are inapposite because the government action
challenged in *McKee II* (and here) is not based on gender or any other suspect
classification.[3]

Welch next contends that the *McKee II* court "should have required that the
SVPA amendments be narrowly tailored to serve their purported purpose."  Asserting
that "authority for that proposition is abundant," he criticizes the *McKee II* court for
stating "that McKee failed to cite any authority requiring that such a law be narrowly
tailored."

McKee cited *Bernal v. Fainter* (1984) 467 U.S. 216 to support his argument.
(*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.)  In *Bernal*, the United States Supreme
Court stated that "[i]n order to withstand strict scrutiny, the law must advance a
compelling state interest by the least restrictive means available."  (*Bernal*, at p. 219.)
The *McKee II* court described the quoted sentence from *Bernal* as "probable dictum,"
distinguishing *Bernal* because it involved a suspect class, alienage.  (*McKee II*, at
p. 1349.)  "We are unaware of any case applying the 'least restrictive means available'
requirement to all cases involving disparate treatment of similarly situated classes," the
*McKee II* court wrote.  (*Ibid*.)  "On the contrary, our review of equal protection case law
shows the two-part test, as discussed in *Moye* and *McKee* [*I*], is the prevailing

---

[3]     *Shaw v. Hunt* (1996) 517 U.S. 899 (*Shaw*), *Hampton v. Mow Sun Wong* (1976)
426 U.S. 88 (*Wong*), and *Weinberger v. Wiesenfeld* (1975) 420 U.S. 636 (*Wiesenfeld*), on
which Welch also relies, are inapposite for the same reason.  (*Shaw*, at pp. 902, 915
[North Carolina redistricting scheme, which segregated voters into "separate and bizarre-
looking districts on the basis of race," violated equal protection where "the remedy . . .
[wa]s not narrowly tailored to the asserted end."]; *Wong*, at pp. 115-116 [invalidating, as
violative of equal protection, Civil Service Commission regulations excluding most
noncitizens from most federal employment positions]; *Wiesenfeld*, at pp. 638-639, 645,
648 [invalidating, as violative of equal protection, gender-based distinction granting
Social Security survivor's benefits to widows but not to widowers].)

11

standard. . . . Therefore, in strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II*, at p. 1349.)

We agree with the *McKee II* court's analysis of this issue. We note that *Moye*, like *McKee II* and like this case, involved an equal protection challenge to a civil commitment statute. The high court in *McKee I* specifically instructed the trial court, on remand, to "determine whether the People, *applying the equal protection principles articulated in Moye* and related cases discussed in the [*McKee I* court's] opinion," could demonstrate that imposing a greater burden on SVP's than on MDO's or NGI's to obtain release from confinement was necessary to promote the state's compelling interest in public safety and humane treatment of the mentally ill. (*McKee I*, *supra*, 47 Cal.4th at p. 1208, italics added.)

The cases Welch cites are inapposite. In *Skinner v. Oklahoma* (1942) 316 U.S. 535 (*Skinner*), the United States Supreme Court reversed a judgment directing that the defendant be sterilized under Oklahoma's Habitual Criminal Sterilization Act, holding that the statute violated equal protection. "[S]trict scrutiny of the classification which a State makes in a sterilization law is essential," the court declared. (*Skinner*, at p. 541.) "When the law lays an unequal hand on those who have committed intrinsically the same quality of offense [e.g. grand larceny and embezzlement] and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." (*Ibid*.) In *United States v. Brandon* (6th Cir. 1998) 158 F.3d 947, 956 (*Brandon*), a nondangerous pretrial detainee challenged a district court

12

order denying him a judicial hearing on whether he could be forcibly medicated with antipsychotic drugs to render him competent to stand trial. (*Brandon*, at p. 949.) Noting that the issue involved the inmate's First Amendment interest in avoiding forced medication that could interfere with his ability to communicate ideas, his Fifth Amendment liberty interest in being free from bodily intrusion, and his Sixth Amendment right to a fair trial, the court concluded that due process considerations required a judicial hearing and that the district court should apply the strict scrutiny standard on remand. (*Brandon*, at pp. 953-955, 957.) In *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 678 (*Sanchez*), the court rejected a facial challenge to the California Voting Rights Act, holding that because the statute is nondiscriminatory, it is subject to rational basis review, not strict scrutiny. (*Sanchez*, at p. 680.) None of these decisions involved an equal protection challenge to a civil commitment statute. *Moye* did, and the California Supreme Court specifically instructed that it be followed on remand in *McKee*. (*McKee I*, *supra*, 47 Cal.4th at p. 1208.) The *McKee II* court did not err in following the high court's directive to apply the equal protection principles articulated in *Moye*.

Welch next contends that the *McKee II* court's failure to distinguish *In re Calhoun* (2004) 121 Cal.App.4th 1315 (*Calhoun*) "demonstrates [that] its equal protection analysis is flawed and should be rejected." We disagree.

In *Calhoun*, the court held that "[e]qual protection principles require that an SVP be provided with the same right as an MDO to refuse antipsychotic medication." (*Calhoun*, *supra*, 121 Cal.App.4th at p. 1351.) The two groups were similarly situated "for purposes of the law concerning the right to refuse antipsychotic medication," the court explained, and the People had failed to demonstrate a compelling state interest that justified a distinction between them in that regard. (*Id.* at pp. 1352-1354.)

*Calhoun* is easily distinguished. The equal protection issue in *Calhoun* turned on the absence of differences between SVP's and MDO's with respect to the need for, and

13

the effectiveness of, antipsychotic medication. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1352.) The equal protection issue in *McKee II*, by contrast, turned on the differences between the two groups with respect to recidivism rates, dangerousness, and diagnoses and treatment. (*Id.* at pp. 1340-1347.) That the *Calhoun* court found no justification for treating SVP's and MDO's differently with respect to forced medication does not mean there can be no justification for treating them differently with respect to their release into society. The inquiries are entirely different.

### III.  Disposition

The November 9, 2012 order committing Welch to the custody of the DSH for an indeterminate term is affirmed.


_____
Mihara, J.


WE CONCUR:



_____
Premo, Acting P. J.




_____
Grover, J.

14