Filed 5/8/26  P. v. J.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087147 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FELJS18000118) |
| J.B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino County, Kawika Smith, Judge.  Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

J.B. suffers from severe mental illness.  In 2014, following a successful not guilty by reason of insanity defense (NGI), the trial court sent J.B. to the Department of State Hospitals at Patton (Patton).  Based on the how the law was interpreted at the time, the People brought timely recommitment

petitions every two years to keep J.B. in treatment due to his continued mental illness and danger to the public. J.B. is still at Patton. He appeals his continued placement there, arguing that under a new interpretation of the law, all the People's petitions to keep J.B. in Patton, dating back to 2014, have been untimely, requiring J.B.'s immediate release from the state hospital system.

J.B. asserts four arguments to support this position. First, he contends the court erred in denying him Penal Code[1] section 4019 conduct credits for his precommitment jail time, his postcommitment jail time before being transferred to Patton, and, more recently, the time he spent in jail after being removed from the conditional release program (CONREP).[2] This means the original recommitment petition, as well as all subsequent extensions, were filed too late, the court lacked jurisdiction to recommit him, and he must be released immediately. Second, he argues the recommitment order must be reversed because the prosecution failed to prove he had been found NGI in a felony case. Third, he asserts the recommitment order was not supported by substantial evidence of his future dangerousness. He also contends he established the medication defense as a matter of law. Finally, J.B. maintains the trial court violated his constitutional and statutory rights to represent himself during the recommitment proceedings.

As we will discuss, although we agree with *People v. Superior Court* (*Frezier*) (2020) 54 Cal.App.5th 652, which entitled NGI acquittees like J.B.

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    See Welfare and Institutions Code section 4360, subdivision (a). CONREP's purpose is to "provide mental health treatment and supervision in the community" for person judicially committed to the state's mental health hospital system. (*Ibid.*)

2

to precommitment conduct credits, we conclude the trial court lacked jurisdiction to consider J.B.'s belated claim to conduct credits at his third recommitment trial. Furthermore, we conclude that once committed to the state hospital system (Patton and CONREP), J.B. could not receive section 4019 conduct credits. This includes for the period when J.B. was housed in jail between CONREP and Patton assignments.

We also are unpersuaded by J.B.'s remaining claims. We agree with the People that J.B. forfeited his argument that they failed to prove he had been found NGI in a felony case. And, regardless, we conclude the doctrine of collateral estoppel bars J.B. from relitigating this issue. Our review of the record indicates substantial evidence supports the court's findings that J.B. remained a substantial danger of physical harm to others and that medication did not effectively control his behavior. The record also reveals that J.B. abandoned his equivocal request to represent himself. Accordingly, we affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 7, 2013, while off his psychiatric medications and using methamphetamine, J.B. threatened his neighbor with a pickaxe inside the neighbor's garage. J.B. was arrested later that day and placed in county jail. Between April and July 2013, the court suspended criminal proceedings against J.B. while he underwent a competency evaluation. J.B. was returned to the trial court and, on July 3, 2014, he was found guilty of assault with a deadly weapon,[3] but not guilty by reason of insanity. That day, J.B. was committed to the Department of State Hospitals. As required, the trial court announced J.B.'s maximum term of commitment (§ 1026.5, subd. (a)(1)); the

---

[3] The maximum prison sentence allowed for this conviction is four years. (§ 245, subd. (a)(4).)

trial court included in that calculation 542 days of section 2900.5 custody credits and 451 days of section 4019 conduct credits for a total of 993 days against his maximum term.[4]  On October 10, 2014, about 14 weeks after being committed to Patton, authorities transported J.B. from jail to the hospital.

In January 2015, Patton sent a letter to the trial court stating that it recalculated J.B.'s maximum commitment term by eliminating the 451 days of conduct credits the trial court awarded under section 4019.  Patton's letter cited several cases to support its approach:  *People v. Mord* (1988) 197 Cal.App.3d 1090 (*Mord*); *People v. Superior Court* (*Waitley*) (1982) 130 Cal.App.3d 39; *People v. Wasley* (1982) 133 Cal.App.3d 344; and *People v. Smith* (1981) 120 Cal.App.3d 817 (*Smith*).  These cases each held that persons committed to a state treatment facility were not entitled to section 4019 conduct credits.

On February 27, 2015, the trial court held a hearing regarding Patton's custody credit recalculation letter.  J.B.'s attorney and the People agreed with the trial court that Patton's calculations were correct, and that J.B.'s new maximum commitment date was January 6, 2017.  This was about seven months beyond the originally determined maximum commitment date.

Given the recalculated maximum commitment term, on June 20, 2016, the People filed their first petition seeking extension of J.B.'s hospital term.

---

[4]    The 91-day difference between the section 2900.5 actual day credits and the section 4019 conduct credits is likely because of the time during which criminal proceedings were suspended pursuant to section 1367 et seq. The above credit calculation left about 15 months to serve on the maximum term.  With the additional 100 days of credits awarded him by Patton for the time he awaited transport to Patton, J.B.'s maximum commitment term would expire in early July 2015.

4

On December 14, 2016, the court ordered his commitment extended by two years. The People filed another recommitment petition on July 3, 2018. On March 18, 2019, the court again extended J.B.'s commitment for two years after he withdrew his opposition to the petition based on the parties' agreement that he would be released to CONREP.[5] He was placed at a CONREP facility on May 21, 2019. His CONREP commitment was renewed twice.

On January 27, 2022, during the second recommitment to CONREP, the owner of the room and board facility where J.B. lived as part of his CONREP placement, reported that J.B. was yelling about " 'a war,' " openly watching pornography while masturbating, and playing loud music. J.B. was observed to be hyper-focused on his cell phone and making delusional comments about being at war and the missiles doing something to his eyes. He explained that he was watching pornography in order to pilot planes. His urinalysis test was positive for amphetamines and methamphetamines; at a later court hearing he admitted the CONREP violations. Pending placement in a more restrictive facility, J.B. was housed at a local jail. While there he was not provided with psychotropic medication or other treatment.

On July 14, 2022, J.B. was transferred from jail to Sylmar Health and Rehabilitation Center (Sylmar). This facility provided greater oversight than the previous CONREP placement. J.B.'s situation at Sylmar deteriorated within a week. A mental health worker from Sylmar testified that, "[h]e was outside of his bedroom masturbating while staring at me" and that his lower area was fully exposed. He went back into his room and then came back out and did it again. Before being transferred back to Patton a week later, he

---

[5] The 2018 hospital report to the court recommended a CONREP placement for J.B.

also touched a female patient inappropriately and refused all psychotropic medications.

The court subsequently revoked J.B.'s CONREP status. On April 27, 2023, the People filed a petition to extend J.B.'s hospital commitment for another two years. In preparation for that hearing, to secure conduct credits for time spent during his most recent jail stay, J.B. requested that Patton provide a copy of its current custody credit calculation. Patton provided a copy of the most recent credits report, which included all time earned from 2013 to the present.

At the recommitment trial on September 11, 2023, J.B. waived his right to a jury so the court held a bench trial. The prosecution presented its case through exhibits, and J.B. testified in his own defense. On November 16, 2023, after taking the matter under submission, the court found J.B. still suffered from a mental disease disorder or defect and that, because of that disorder, he would have serious difficulty controlling his behavior and represented a substantial danger of physical harm to others. (See *In re Howard N.* (2005) 35 Cal.4th 117, 132 [an extended detention scheme must contain a requirement of serious difficulty in controlling dangerous behavior].)

The court then set a further hearing to address additional reports and the issue of conduct credits for J.B.'s jail time while awaiting placement at Sylmar. On December 18, 2023, the trial court ruled that J.B. was not entitled to conduct credit for time spent in custody while waiting for his transfer back to a more restrictive level of care.

DISCUSSION

A. *California's NGI Scheme*

Prior to 1978, an NGI committee was sent to a state hospital for an indeterminate term, even if the underlying offense was punishable by a determinate sentence. (*In re Moye* (1978) 22 Cal.3d 457, 461 (*Moye*).) In *Moye*, after a bench trial, a judge convicted a defendant of felony "hit and run" driving but also found the defendant insane. At the time, the maximum punishment for that crime was five years. (*Ibid.*) The trial court committed the defendant to the state hospital system until " 'his sanity [was] restored.' " (*Ibid.*) After seven years, the defendant petitioned for release saying he could not be held in actual or constructive custody of the hospital for any time in excess of five years. (*Ibid.*)

Our Supreme Court held that "principles of equal protection require . . . that persons committed to a state institution following acquittal of a criminal offense on the ground of their insanity cannot be retained in institutional confinement beyond the maximum term of punishment for the underlying offense of which, but for their insanity, they would have been convicted." (*Moye, supra*, 22 Cal.3d at p. 467.) The court further held, however, "[a]s in the case of . . . other dangerous offenders, persons [found NGI] . . . may be subjected to a period of extended commitment once the maximum term of punishment has expired. . . ." (*Ibid.*)

Lawmakers responded by codifying *Moye* the following year. (Stats. 1979, ch. 1114, §§ 1–3, pp. 4049–4053.) The new law amended section 1026, modified and expanded section 1026a, renumbered it as 1026.2,[6] and added

---

6    Section 1026.2 describes the sanity restoration process.

section 1026.5. Among other changes, the Legislature required that a trial court set a maximum term of commitment to a state hospital that would be identical to the most a committee would receive if sent to prison, including applicable credits. (See §§ 1026, subd. (e)(2), 1026.5, subd. (a)(1).)

Currently, as a result of the changes *Moye* initiated, when a defendant is found NGI, section 1026 provides that the court "shall direct that the defendant be committed to the State Department of State Hospitals for the care and treatment of persons with mental health disorders . . . ." (§ 1026, subd. (a).) NGI defendants "may be released from a state hospital: (1) upon restoration of sanity pursuant to the provisions of section 1026.2; (2) upon expiration of the maximum term of commitment under section 1026.5, except as such term may be extended under the provisions of subdivision (b) of section 1026.5; or (3) upon approval of outpatient status pursuant to the provisions of section 1600 et seq." (*People v. Barner* (2024) 100 Cal.App.5th 642, 658.)

The maximum term of commitment means "the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted, including the upper term of the base offense and any additional terms for enhancements and consecutive sentences which could have been imposed less any applicable credits as defined by Section 2900.5, and disregarding any credits which could have been earned pursuant to Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3." (§ 1026.5, subd. (a)(1).) Section 2900.5 provides that, "[i]n all felony and misdemeanor convictions . . . when the defendant has been in custody, including, but not limited to, any time spent in a jail, . . . all days of custody of the defendant, *including days . . . credited to the period of confinement pursuant to Section 4019*, . . . shall be credited upon his or her

term of imprisonment . . . ." (§ 2900.5, subd. (a), italics added.) Relevant here, section 4019 applies "[w]hen a prisoner is confined in a county jail . . . following arrest and prior to the imposition of sentence for a felony conviction." (§ 4019, subd. (a)(4).) For each four-day period a prisoner is confined to jail, "one day shall be deducted from the prisoner's period of confinement unless it appears by the record that the prisoner has refused to satisfactorily perform labor as assigned by the sheriff" and "one day shall be deducted from the prisoner's period of confinement unless it appears by the record that the prisoner has not satisfactorily complied with the reasonable rules and regulations established by the sheriff." (§ 4019, subds. (b), (c).) We refer to these additional credits as "conduct credits."

A commitment may be extended for two years if the court or a jury finds "the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1), (8).) A petition to extend the commitment is to be filed by the district attorney no later than 90 days before the expiration of the commitment unless good cause is shown. (*Ibid.*, subd. (b)(2).)

B. *The Trial Court Lacked Jurisdiction to Retroactively Award J.B.*
   *Precommitment Conduct Credits*

J.B. contends the trial court erred by denying him section 4019 conduct credits for his precommitment time between 2013 and 2014, postcommitment time in jail prior to placement at Patton, and his 2022 post-CONREP jail time. In his view, this court should follow its prior decision in *Frezier* to conclude he was entitled to these conduct credits, retroactively recalculate his maximum commitment date to include the additional conduct credits, find that the People filed their recommitment petition after the court's jurisdiction

9

to hear it expired, and order J.B. immediately released.  The People respond that J.B. forfeited his challenge to the trial court's denial of precommitment credits by failing to raise it in the trial court or in an earlier appeal, and by not presenting an adequate record for review.

We need not address the People's forfeiture arguments because, even considering J.B.'s arguments on the merits, we conclude the trial court lacked jurisdiction to retroactively grant the relief he seeks.

1.  Applicability of Conduct Credits to NGI Detainees

The proper interpretation of the statutes governing the maximum term of commitment for individuals found NGI is a question of law we review de novo.  (*Frezier, supra*, 54 Cal.App.5th at p. 659.)

In any case of statutory interpretation, our task is to determine the Legislature's intent and effectuate the law's purpose.  (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)  We begin with the language of the statute itself.  (*Ibid.*)  We give the words their plain and commonsense meaning, while also considering the context and framework of the entire statutory scheme, keeping in mind its nature and purpose.  (*Ibid.*)  "If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' "  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1126.)  We may also "consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy."  (*Ibid.*)

a.  *Precommitment Conduct Credits*

As discussed, courts calculate the maximum commitment term for an NGI detainee by determining "the longest term of imprisonment which could

10

have been imposed for the offense or offenses of which the person was convicted" and then subtracting "any applicable credits as defined by Section 2900.5." (§ 1026.5, subd. (a)(1).) J.B., relying on *Frezier*, seeks credit for actual custody days served, precommitment conduct credits, and for any time spent housed in a jail facility when he was transferred from one treatment environment to another.

In response, the People echo the same arguments as the respondent in *Frezier*, citing to the same legal authority. (E.g., *Mord, supra*, 197 Cal.App.3d 1090; *Smith, supra*, 120 Cal.App.3d 81; *People v. Campos-Castillo* (1986) 176 Cal.App.3d 926, 930–931; and *People v. Bodis* (1985) 174 Cal.App.3d 435 (*Bodis*).) Supported by those cases, the People argue the plain language of section 4019 does not apply to J.B. (See *Frezier, supra*, 54 Cal.App.5th at p. 666.)

We reject the People's analysis, finding instead that the most reasonable interpretation of the law is that NGI acquittees are entitled to precommitment conduct credits. And, as in *Frezier*, we are unconvinced by the authority cited by the People to support their position. For instance, in *Frezier* we observed that *Smith* involved a felony conviction underlying an NGI finding. The *Smith* court looked to section 4019 and its applicability to the NGI setting, but the early version of section 4019 before the *Smith* court did not allow conduct credits in felony cases. (*Frezier, supra*, 54 Cal.App.5th at pp. 663–664.) Given that fact, we explained the appellate court in *Smith* had no occasion to consider whether conduct credits were *statutorily* authorized for felons who were found NGI. (*Ibid*.) *Smith* instead looked to the equal protection analysis in *People v. Sage* (1980) 26 Cal.3d 498 that found it was unconstitutional to award conduct credits against *prison or jail sentences* to misdemeanants, but not felons. (See *Smith, supra*, 120

11

Cal.App.3d at pp. 825–826; *Sage, supra*, 26 Cal.3d at pp. 507–508.) *Smith* concluded that persons found NGI were differently situated than either felons or misdemeanants and, therefore, no constitutional infirmity existed by denying conduct credits to NGI acquittees. (*Smith,* at p. 826.)

We found *Bodis* unpersuasive because, though the defendant in *Bodis* sought precommitment conduct credits, *Bodis*'s analysis relied on statutes governing *post*commitment conduct credits. (*Frezier, supra*, 54 Cal.App.5th at p. 664.) This appeared to us to be an error in the *Bodis* analysis and, therefore, unconvincing.

We found *Mord* flawed because it relied on *Smith*'s statutory analysis which, as we explained above, was tethered to a then-outdated version of section 4019. Based on that approach, *Mord* turned to and "reject[ed] an equal protection claim to the right of [NGI detainees] to earn [precommitment custody credits]." (*Frezier, supra*, 54 Cal.App.5th at p. 665.) Finally, we rejected the reasoning in *Campos-Castillo* because that case simply relied on *Smith* without giving any further reasoning. (*Id.* at p. 667, fn. 7.)

The People make two other arguments to support their position. First, in the decades since *Mord*, *Smith*, *Bodis*, and *Campos-Castillo*, the Legislature has taken no action to amend sections 2900.5 or 4019 to insulate those statutes from the holdings in those cases. We are unpersuaded. *Frezier* is six years old, and the Legislature has not responded to it either. Little is revealed here by legislative inaction to either set of cases.

Second, the People point to language in sections 2900.5 and 4019 that would appear to exclude NGIs from precommitment conduct credit, specifically, references to "conviction" and "sentencing." But as we explained in *Frezier*, the interplay between sections 1026 and 1026.5, on the one hand,

12

and sections 2900.5 and 4019 on the other hand, reveals ambiguities. (*Frezier, supra*, 54 Cal.App.5th at p. 666.) Using the People's argument, "would mean that no person committed pursuant to section 1026 would be eligible for *any* credits, because they are not 'convicted' or 'imprisoned.' This would render the reference in section 1026.5 to 'applicable credits as defined by Section 2900.5' entirely superfluous. [Citation]." (*Id*. at p. 667.) Such an approach would run afoul of rules regarding statutory interpretation. (*Ibid*.) This we declined to do in *Frezier*, and we decline to do now. As we concluded in *Frezier*, "Considering the statutory scheme in the proper context, as we must, we conclude that section 1026.5 requires that the trial court apply statutes that typically apply to sentencing—sections 2900.5 and 4019—to determine the 'longest term of imprisonment' that could be imposed, which section 1026.5 establishes to be equal to the maximum term of commitment for a person adjudged not guilty by reason of insanity." (*Id*. at pp. 667–668.)

To be sure, we agree that "[c]onfinement of a person found to be insane and sentenced under section 1026 of the Penal Code is for care and treatment, not punishment." (*Bodis, supra*, 174 Cal.App.3d at p. 437; see also *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 819 [recognizing that section 1026.5 proceedings "are directed at confinement for treatment rather than punishment"].) That observation leads to the conclusion that conduct credits do not further the goal of successful mental health treatment because psychiatric progress takes time, and any scheme that shortens time to treat someone is not in the interests of the NGI committee or the public. But *Moye* identified another critical issue when considering NGIs. "[T]he possibility of an indefinite, lifetime confinement provided by section 1026 may well deter from entering an insanity plea those very persons most in need of hospital treatment. Such a result serves neither the interest of the public nor

13

those . . . who have entered insanity pleas." (*Moye, supra*, 22 Cal.3d at p. 468.)  Further, the commitment extension provisions in section 1026.5 offer opportunities for the continued treatment of an NGI committee.

For these reasons, *Frezier* remains compelling, and sound policy reasons support the award of precommitment conduct credits to NGI detainees.

### b.  *Postcommitment and Post-CONREP Jail Time Credits*

J.B. also contends he is entitled to conduct credits for the time he spent in jail after commitment and prior to placement, and after his CONREP revocation.

We find *Buckhalter* instructive here.  In *Buckhalter*, a defendant sentenced to prison was temporarily transferred back to county jail during sentencing remand proceedings.  (*People v. Buckhalter* (2001) 26 Cal.4th 20, 22.)  He argued he should receive conduct credits under section 4019 for the time he spent in jail.  (*Id.* at p. 28.)  The high court disagreed, explaining that the "defendant's temporary removal from state prison to county jail as a consequence of the remand did not transform him from a state prisoner to a local presentence detainee.  When a state prisoner is temporarily away from prison to permit court appearances, he remains in the constructive custody of prison authorities and continues to earn sentence credit, if any, in that status."  (*Id.* at p. 33.)

We find the *Buckhalter* analysis persuasive.  In the two postcommitment periods for which J.B. seeks conduct credits, he was housed in county jail while awaiting placement orders for a new mental health facility.  While waiting for his new treatment facility assignment, J.B. was still committed to the Department of State Hospitals under section 1026.  And his temporary stay in jail post-CONREP did not return him to

14

precommitment detainee status.  J.B. argues he should receive additional credit because he was not medicated or provided mental health services during this time.  Although it is unfortunate the jail did not provide him with mental health treatment, the statutory scheme does not base entitlement to credits on treatment received while in interim custodial housing.

### c. *The Court Lacked Jurisdiction to Grant J.B. Retroactive Relief*

J.B. argues that with section 4019 conduct credits restored to his maximum term calculations, the initial 2016 extension petition was filed after his term expired and the court lacked jurisdiction to act.  Without jurisdiction to act initially, the original extension and all following extension orders are invalid.

It is generally true that if the People do not file a petition before the maximum commitment date passes, the time for seeking a commitment extension lapses, and the NGI acquittee no longer comes within the statute. (See *People v. Allen* (2007) 42 Cal.4th 91, 104 (*Allen*) [concluding as to the mentally disordered offender statute that the statutory requirement of filing before the expiration of the commitment is mandatory and that failure to do so invalidates any subsequent purported extension]; *People v. Lara* (2010) 48 Cal.4th 216, 235–236 (*Lara*) [extending *Allen* to the NGI context and concluding that "if an extension petition is not filed before the current commitment ends, the defendant is no longer subject to constraint under the NGI or MDO statutes"].)  But even if a provision is mandatory, "the failure to comply with its requirements does not necessarily mean a court loses *fundamental* jurisdiction resulting in 'an entire absence of power to hear or determine the case, [or] an absence of authority over the subject matter or the parties.'" (*Allen,* at p. 101, fn. 5.)

15

Here, the trial court had jurisdiction over J.B. in July 2014 when it ordered him committed and awarded him conduct credits, but its error in rescinding J.B.'s conduct credits resulted in an order made in excess of the court's jurisdiction. " ' "[A]n act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time." ' " (*Lara, supra*, 48 Cal.4th at p. 225.) Thus, the order remained valid unless and until it was judicially set aside.

In this case, the commitment term the court established in February 2015 was never appealed or set aside. J.B.'s counsel expressly agreed to the new maximum commitment date, and J.B. did not appeal the order. Under *Allen* and *Lara* a court only lacks fundamental jurisdiction to adjudicate an extension petition if it is filed after the original commitment expired. Because the original NGI commitment ordered by the court was never set aside, the maximum commitment date did not expire and remained valid when the People filed their first extension petition. Therefore, the petition was timely, and the court had jurisdiction to grant it, extending the commitment.

At the next two recommitment trials, however, the trial court lacked jurisdiction to modify the maximum term of the original commitment because in an NGI setting the court's "continuing jurisdiction is narrowly circumscribed by section 1026 et seq., and none of these sections addresses the underlying maximum term of commitment." (*People v. Gray* (2024) 101 Cal.App.5th 148, 166.) At each subsequent recommitment hearing, section 1026.5 provided the court with jurisdiction to consider only whether the patient remained a person "committed under Section 1026 for a felony . . . [who] by reason of a mental disease, defect, or disorder represents

16

a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1), (8).) It did not afford the court subject matter jurisdiction to reexamine the propriety of the original commitment or the basis for the original maximum commitment term calculation. Thus, when J.B. belatedly raised the conduct credit issue during the most recent recommitment proceeding in 2023, it was outside the scope of the court's jurisdiction under section 1026, et seq.[7]

Furthermore, contrary to J.B.'s view, *Lara* and *Allen* do not provide authority to retroactively challenge a commitment order that was valid when issued and remained unchallenged until nearly a decade later. In *Gray*, the court explained that "nothing in *Lara* addressed how the maximum commitment term was originally calculated or whether it could later be modified by an NGI acquittee's nonstatutory stand-alone 'petition' for relief citing inapplicable statutory changes." (*Gray, supra*, 101 Cal.App.5th at p. 167, fn. 13.) The same could be said of J.B.'s appeal of his third recommitment petition. Whereas the defendant in *Lara* challenged the late

---

[7] During oral argument appellant's counsel contended that even if the court could not apply the 451 days of precommitment conduct credits, it could at least have awarded J.B. actual and conduct credit for the 169 days J.B. recently spent in jail, without medication or treatment, after leaving CONREP and before being returned to Patton. Without medication or other treatment, counsel claimed J.B.'s jail time was not part of the hospital commitment and J.B. was entitled to section 2900.5 credits. Counsel did not provide separate authority supporting this assertion, and we have found none. Section 2900.5 provides credit for actual jail time prior to sentencing and "the period between the date of sentencing and the date the person is delivered to the agency." (§ 2900.5, subds. (a), (d), (e).) In the NGI commitment context, under section 1026.5 J.B. was entitled only to section 2900.5 credit for his precommitment time in jail, and postcommitment jail time prior to being transferred to Patton, but not the post-CONREP period. And as we explained above, J.B. was not entitled to conduct credit for this period because he remained under the constructive custody of the Department of State Hospitals.

recommitment petition in his case at the first opportunity (*Lara, supra,* 48 Cal.4th at p. 221), J.B. attempts to contest the purportedly late filing of the first recommitment petition on appeal of the court's granting of the third. *Lara* provides no authority for the trial court or this court to belatedly consider how the original commitment term was calculated.

Accordingly, the trial court lacked jurisdiction to consider J.B.'s conduct credit claim and to modify his maximum commitment term.

C. *Proof That the Commitment Offense was a Felony*

J.B. contends the recommitment order must be reversed because the prosecution failed to prove, and the trial court did not find, that he had been found NGI in a felony, as opposed to a misdemeanor case. Relying on this court's opinion in *People v. Jenkins* (1985) 168 Cal.App.3d 41 (*Jenkins*), the People respond that J.B. forfeited this issue. Additionally, the People argue that because this offense-related predicate was already established in a prior recommitment proceeding, J.B. is collaterally estopped from challenging it on appeal of subsequent recommitment hearings.

First, we agree with the People that J.B. forfeited this issue on appeal. " 'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.' [Citation.] ' "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" ' [Citation.] Additionally, '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' [Citation.]" (*People v. McCullough* (2013) 56 Cal.4th 589, 593.) Here, for the first time on appeal, J.B. raises the question of the trial court's alleged failure to find the felony predicate that would allow the state to

recommit J.B. to Patton. Had J.B. raised this issue in the trial court, the People could have responded to it, and the court could have taken the steps it found reasonable to address the concern. J.B.'s failure to raise this question to the trial judge deprived the People and the trial court of an opportunity to grapple with the objection. J.B. has forfeited the issue.

Even were we to reach the merits, *Jenkins* supports the trial court's ruling. In *Jenkins,* this court considered a similar claim that the prosecution failed to present evidence that the NGI acquittee's commitment offense satisfied the offense-related predicate required by section 1026.5, subdivision (b)(1).[8] (*Jenkins, supra,* 168 Cal.App.3d at p. 45.) The court noted that section 1026.5 is not itself a crime, and explained that the offense-related predicate described in section 1026.5 operated not as an element, but as "a preliminary qualifying condition to define those persons eligible for a section 1026.5 recommitment and depends for its proof on the circumstances of the underlying offense which in most cases will be free from dispute." (*Id.* at p. 45.) Thus, the court found it appropriate to require the defendant "to raise the issue of the offense-related predicate before the People are required to introduce evidence and the court is required to make an explicit finding on the issue." (*Id.* at p. 46.) The court further observed that "while each successive recommitment requires a de novo determination regarding the defendant's dangerousness," if the offense-related predicate was 'actually litigated' and established in the first recommitment proceeding, the doctrine

8       In 1985, section 1026.5, subdivision (b) described specific code violations for which a commitment could be extended. If the felony for which the committee was found NGI was not specifically listed, section 1026.5 allowed a hospital extension for felonies "involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person." (Stats. 1982, ch. 650, § 1, p. 2664.)

of collateral estoppel would apply to subsequent recommitments. (*Id.* at p. 46, fn. 8.)

In J.B.'s view, *Jenkins* was wrongly decided. He objects primarily to putting the onus on the defendant to request proof that the felony requirement has been met. But logic supports the *Jenkins* procedure because the entire recommitment process is only authorized for those NGI acquittees who committed a felony. (§ 1026.5, subd. (b)(1).) It is reasonable to assume an individual committed for a misdemeanor (a) would object long before the recommitment hearing commenced, and (b) would have been released prior to the expiration of the initial two-year commitment term. (See § 19.2 ["In no case shall any person sentenced to confinement . . . on conviction of a misdemeanor . . . be committed for a period in excess of one year"]; § 1026.5, subd. (a)(3) ["In the case of a person committed to a state hospital or other treatment facility pursuant to Section 1026 . . . who committed a misdemeanor, the maximum term of commitment shall be the longest term of county jail confinement which could have been imposed for the offense or offenses which the person was found to have committed, and the person may not be kept in actual custody longer than this maximum term."].) Nonetheless, we need not decide this question because we conclude collateral estoppel precludes this challenge.

As an initial matter, we note that modern courts use the term "issue preclusion" instead of "collateral estoppel." (*Samara v. Matar* (2018) 5 Cal.5th 322, 326 (*Samara*).) "The law of preclusion helps to ensure that a dispute resolved in one case is not relitigated in a later case." (*Id.* at p. 326.) But because the parties refer to the doctrine as collateral estoppel, we do the same to avoid confusion.

20

Collateral estoppel "prevents 'relitigation of previously decided issues,' " and "applies only '(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party.' " (*Samara, supra*, 5 Cal.5th at p. 327; *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 (*Lucido*).) "Courts have understood the ' "necessarily decided" ' prong to 'require[ ] only that the issue not have been "entirely unnecessary" to the judgment in the initial proceeding.' " (*Samara,* at p. 327.)

J.B. contends the record reveals nothing about his first recommitment order except that it happened. An insufficient record of a court proceeding in this state is a solvable problem, which does not justify the unnecessary time and expense of a remand.[9] On our own motion, this court takes judicial notice of the Superior Court for the County of San Bernardino's minutes reflecting the December 7, 2016 court trial on the first recommitment petition

---

[9] Courts are advised to consider the public policies underlying the collateral estoppel doctrine to determine "whether its application in a particular circumstance would be fair to the parties and constitute sound judicial policy." (*Lucido, supra*, 51 Cal.3d at pp. 342–343.) These policies include "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." (*Ibid*. at p. 343.) Although the party asserting collateral estoppel bears the burden of establishing its requirements (*id*. at p. 341), we conclude judicial economy is best served by supplementing the record with a readily available court order and preventing unnecessary relitigating to prove an indisputable fact. No other policy concern counsels against this conclusion.

and its December 14, 2016 ruling.[10]  (Evid. Code, §§ 451, subd. (a) [authorizing judicial notice of this state's decisional law], 452, subd. (d)(1) [allowing courts to take judicial notice of court records from other courts of this state].)

The existing record already contains the prosecutor's declaration accompanying the 2016 recommitment petition, which certified that "[J.B.] was committed to the Department of Mental Health under Penal Code [section] 1026.5[, subdivision] (b) for a felony having been found insane." Thus, J.B. and his counsel were alerted to the People's view that he qualified for a recommitment proceeding.

The court's December 7, 2016 minutes demonstrate that J.B. was represented by counsel and testified at the hearing.  In other words, he attended the proceedings and had the opportunity to challenge the felony predicate and present evidence disputing it.  At the conclusion of the hearing, the court granted the petition for extension of commitment, finding that "[J.B.] meets the criteria of [Penal Code section] 1026.5[, subdivision] (b)(1); that [J.B.] still suffers from a mental disease, disorder or defect; and as a result of that disorder, [J.B.] will have serious difficulty controlling his behavior such that he represents a substantial danger of physical harm to others."  (See *In re Vicks* (2013) 56 Cal.4th 274, 314, italics added [explaining that a court may take judicial notice of " 'any orders, findings of facts and conclusions of law, and judgments within court records. . . . [and] are free to take judicial notice of the *existence* of each document in a court file, *including the truth of results reached*' "].)  In finding J.B. "[met] the criteria of [Penal

10    Prior to oral argument, we notified the parties of our intent to take judicial notice of the December 14, 2016 minutes and attached them for the parties' review.  No party objected during oral argument.

22

Code section] 1026.5[, subdivision] (b)(1)," the court necessarily found he had been committed for a felony.

Thus, the court's ruling on J.B.'s first recommitment addressed the identical issue of whether he was committed on a felony, the issue was presented by the extension petition and supporting documentation, and J.B. had the opportunity to present evidence and witnesses. (See *People v. Sims* (1982) 32 Cal.3d 468, 484 ["An issue is actually litigated '[w]hen [it] is *properly raised*, by the pleadings or otherwise, and is submitted for determination, and is *determined.*"]; *Lucido, supra*, 51 Cal.3d at p. 341 [issue actually litigated where each party presented evidence and witnesses in support of their positions and had the opportunity to present full cases].) The issue was necessarily decided as it was a required part of the court's finding that he met the section 1026.5, subdivision (b)(1) criteria. (See *Samara, supra*, 5 Cal.5th at p. 327 [an issue is "necessarily decided" if it is not "entirely unnecessary" to the initial judgment].) The adjudication was final as to his first recommitment petition, and collateral estoppel is now being asserted by the same party that filed the initial recommitment petition. Accordingly, because all the elements are satisfied, we conclude J.B. is collaterally estopped from arguing in the present appeal that the prosecution failed to prove and the court failed to find that he was found NGI in a felony case.

D. *Substantial Evidence Supports J.B.'s Future Dangerousness and Inadequate Proof of His Medication Defense*

Establishing that an NGI defendant poses a substantial danger of physical harm to others "requires proof that the person has serious difficulty controlling his dangerous behavior." (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 (*Williams*).) The factors required for an extended

commitment must be proven beyond a reasonable doubt. (*Ibid.*; see § 1026.5, subd. (b)(7).)

The individual may defend against the extension by proving by a preponderance of evidence that medication effectively controls his mental illness to make him not dangerous and that he will take his medication in a completely unsupervised environment. (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1601–1602 (*Bolden*).)

"We review an order to extend commitment under section 1026.5 by applying the substantial evidence test, examining the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt. (*Williams, supra*, 242 Cal.App.4th at p. 872.)

### 1. Additional Facts

The trial occurred in October 2023. All parties acknowledge J.B. was not medicated in jail following his CONREP revocation and experienced difficulties upon his return to Patton in July 2022. Accordingly, we focus on the reports from the year preceding trial.

In November 2022, J.B. moved aggressively toward staff members who intervened when J.B. overstayed his turn on the computer. He was cooperative with his psychiatric medications but reported that he only needed them for sleep.

Interdisciplinary notes from December 2022 described his behavior as "loud, angry, irritable, [and] demanding," showed he had "difficulty following redirections from staff," and reflected him yelling, "I'm God! I do what the f*** I want." J.B. also refused medications nine times between November 2022 and January 2023, because he believed the CONREP director found "compelling evidence" that he did not have a mental illness.

24

Dr. Kelly Hunsicker's January 2023 report stated that J.B. did not believe he had a mental disorder. She noted that he "exhibited an increase in his mental health symptoms including impulse control deficits, irritability, paranoia, hypomania, hyperverbal speech, disorganized thinking, [and] racing thoughts" and opined that he did not appreciate that his mental illness "impairs his decision making and increases his potential for future violence." He believed he had few, if any, risk factors for future violence, and "[w]hen his assertion that he has not exhibited violence in years was challenged and contrasted against a lengthy history of sexual aggression (exposing himself to a unit psychologist (6/2015), masturbating to a female staff at SHRC (July 2022), being inappropriate with female staff at DSH-Patton during his current placement), [J.B.] dismissed such behaviors as irrelevant. He was unwilling to consider that his behaviors are aggressive and create high risk situations with the potential for violence. He further minimized the harm and trauma he likely caused the victims of his conduct. Moreover, he was unwilling to consider that his impulse control deficits, poor judgment and hypersexual behaviors are symptoms consistent with his mental illness."

In February 2023, J.B. followed a group of female nursing students around and then stood staring at them, which caused the students to feel uncomfortable and unsafe. A month later, he clenched his fists while yelling at a staff member who asked him to buss his breakfast tray. The following day, he made a slashing motion across his neck while walking within inches of peers. A week later, he told a therapist she had ants on her back and brushed her lower back with his hands. The other staff member present did not see any ants in or around the therapist. Later the same day, a female custodian reported that J.B. brushed up against her backside when she knelt

25

to tie her shoelaces even though the hallway was not crowded and there was no reason for him to walk so close to her. In April 2023, hospital police officers were called to deescalate a situation because J.B. was yelling, verbally aggressive, and posturing with clenched fists.

The May behavioral guideline plan for J.B. reported issues such as "standing too close to female staff members" and "us[ing] his size or loud voice to pressure peers to do what he wants."

Dr. Hunsicker's June 2023 review of the prior six months of treatment records noted a worsening of his psychiatric and behavioral status, explaining that "[a] significant contributor to his decompensation has been his refusal of psychiatric medications." She noted that he continued to exhibit "symptoms of his mental health disorder including impulse control deficits, mood instability, boundary violations and hypersexual behaviors" that were "so severe that the team implemented behavioral guidelines." Although he demonstrated improved psychiatric status and engagement in treatment within the weeks preceding the report, she indicated his willingness to listen to feedback remained relatively poor.

An early August psychology note indicates Patton received a call from a CONREP liaison reporting that J.B. left a sexually explicit voicemail for a clinician. The content reportedly "included discussion of orgasms, twisting nipples, and asking the clinician to get naked so Mr. Bryant could paint her 'beautiful body.'"

At trial, J.B. disagreed with a report from June 2023 stating that he was selling his Buspar, but he acknowledged he had or planned to barter or loan it to someone. He said, however, that he would continue to take Buspar and Seroquel if released into an unsupervised environment because they gave him "a better quality of life."

26

J.B. described two incidents where he was attacked and reacted nonviolently. In April 2023, another patient pushed him into the bathroom and then hit him in the neck. The patient tried to swing at him again, so J.B. held the man's hands until others arrived. In July, another patient punched him 15 or 16 times in the back after he sat down to eat lunch, and J.B. did not respond.

When asked about the sexually explicit voicemail he left for a prior CONREP clinician in August 2023, he admitted it was explicit, but claimed he was reading her a poem he wrote.

## 2. Analysis

J.B. acknowledges for purposes of appeal that he suffers from a mental disease, but he argues the record lacks substantial evidence supporting the court's conclusion that he represented a substantial danger of physical harm to others. We disagree.

The court considered, and was entitled to rely upon, Dr. Hunsicker's January 2023 opinion that "[h]is lack of insight into his mental health disorder places him at increased risk for violence." "A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879.) Since that time, Dr. Hunsicker has opined that his psychiatric and behavior status have declined.

Although expert medical opinion evidence based upon conjecture, as opposed to relevant facts, does not constitute substantial evidence (*People v. Redus* (2020) 54 Cal.App.5th 998, 1011), the record discloses multiple instances of verbal, physical, and sexual aggression supporting the conclusion that he represents a substantial danger to others, particularly women. He

27

repeatedly reacted aggressively to staff directions by clenching his fists, moving close to the staff member, and yelling.[11] He also threatened another inmate by making a slashing motion across his neck. Although he downplays his unwanted and inappropriate sexual touching of, and statements to, female staff as "bad behavior" comparable to that of "successful young professional men at a bar on Friday night," these characterizations understate the seriousness of the behavior and threat it implies when he is not within a controlled hospital environment. All the women apparently felt uncomfortable enough to report the behavior, and the nursing students expressly stated they felt unsafe. And this behavior occurred while J.B. *was* medicated. Furthermore, unlike men at a bar, J.B. has a demonstrated history of going further and acting on his behavior in threatening ways such as by pulling out his penis during a therapy session and openly masturbating while staring at nurses. His criminal history also includes stalking, corporal injury on a spouse, and assault.

The cases J.B. relies upon are distinguishable. In all the cases, the record disclosed the defendant had not engaged in *any* aggressive or violent behavior while in the hospital or CONREP, whereas J.B. has routinely and recently behaved aggressively toward staff and other patients. (See *People v. Jenkins* (2023) 95 Cal.App.5th 142, 151 ["there is no evidence she has been violent or physically aggressive since her commitment offense in 1999"]; *People v. Cheatham* (2022) 82 Cal.App.5th 782, 790 ["Cheatham has never engaged in behavior dangerous to others because of his mental disorder."];

---

11 We agree with J.B. that the fact he is large, African American man who is willing to speak up for himself cannot weigh against him. But the record discloses some evidence that he purposely uses his size to intimidate peers and staff, which is appropriately considered aggressive behavior.

*Redus, supra*, 54 Cal.App.5th at p. 1003 ["Dr. Tekeste had not witnessed appellant engaging in any aggressive or violent behaviors in the hospital. Nor had she found anything in her record review to suggest that he ever committed any acts of violence since the commitment offense."]; *People v. Johnson* (2020) 55 Cal.App.5th 96, 103 ["There had been no indication of violence or aggression in all of the years appellant had been hospitalized or in the community on CONREP following his prison term."].)

J.B. also contends he established the medication defense as a matter of law. To establish the affirmative defense of medication compliance, the NGI committee must prove by a preponderance of the evidence that (1) his medication is effective in controlling his behavior, making him not dangerous, and (2) he will continue to take his medication without fail in a completely unsupervised environment. (*Bolden, supra*, 217 Cal.App.3d at pp. 1601– 1602.) J.B. cites the court's statement that the reports indicated the medications put J.B.'s bipolar disorder in remission, and he relies on the court's acceptance of his testimony that he would continue taking his medication postrelease.

These statements do not end the inquiry. As the court acknowledged, even though Dr. Hunsicker considered the bipolar disorder to be in remission, the record indicates the medication was not fully controlling his aggressive behavior. Moreover, the court was not required to rely solely on J.B.'s statements in assessing whether he would continue to take his medication in an unsupervised environment. Reports showed J.B. used methamphetamine while in the less structured environment of CONREP and refused all psychotropic medications when he was subsequently taken to Sylmar. During the year leading up to the trial, he refused medications nine times, and his testimony during trial reflected he did not think it was entirely

29

problematic to barter or loan his Buspar to others. Dr. Hunsicker also noted in her June 2023 report a worsening of J.B.'s psychiatric status and behavior over the past six months, adding that refusal of psychiatric medications was "[a] significant contributor to his decompensation." Given this evidence, the court could reasonably have found J.B. had not established by a preponderance of the evidence that he would continue to take his medication without fail in an unsupervised setting.

Accordingly, we conclude substantial evidence supported the recommitment order and the court's finding that J.B. did not establish the medication compliance defense.[12]

E. *J.B.'s Request to Represent Himself Was Equivocal and Abandoned*

Finally, J.B. contends the court violated his constitutional and statutory right to represent himself. The People respond that, even assuming J.B. had the right to represent himself during commitment extension proceedings, his request was equivocal, and he abandoned it. We agree.

1. Additional Facts

On August 28, 2023, during a pretrial discussion of whether he wanted a court or a jury trial, J.B. asked the court:

> "Is there any way that I can represent myself? And this has nothing to do with [J.B.'s trial counsel]. I think he's a great public defender. There's just so my [*sic*] details about certain

---

[12] As J.B. may undergo further recommitment proceedings in the future, we observe that the records suggest that since 2016, the state hospital psychologists have not used any of the standard violence risk assessment tools in formulating their opinions. Studies indicate these tools offer more predictive value than unstructured clinical judgments, and courts are beginning to question the appropriateness of relying solely on unstructured clinical judgment in evaluating recommitments. (See *Jenkins, supra*, 95 Cal.App.5th at pp. 156–160 (conc. opn. of Buchanan, J.).)

things that I've had to write so many grievances just to cover myself and there's certain witnesses that I will be having to call and certain things brought up in order for me to paint a picture about a picture that I might have to show in my defense.

"So is there a way that I can represent myself? And if I was to represent myself, I would want to do a jury trial."

The court responded that a criminal defendant has a right to represent himself during his criminal trial, but as they were past that point, the court would be inclined to deny such a motion if it was presented. After the court advised J.B. to speak with his attorney, counsel suggested returning on another date after the parties had time to research the issue, and the court agreed.

The issue of his right to represent himself was not discussed at the subsequent hearing. However, defense counsel referenced the fact that he and J.B. had discussed privately whether he wanted a court trial or a jury trial and then asked J.B., on the record, whether he wanted a court trial like they discussed. J.B. responded, "Yeah. We can go ahead and do that." The court described the difference between the two types of trials, allowed J.B. to ask a question, and then J.B. confirmed he would like to proceed with a bench trial. He then brought up the issue of complaints he filed at Patton that he wanted to subpoena, and his attorney discussed with the prosecution and J.B. how quickly they could get those and how it might impact the timing of the trial. J.B. also said he needed "original copies of all of the grievances that I've written so that I can give them to Mr. Marmont so that *he can read over them and use them for however he can use them*." (Italics added.)

The court held a bench trial. At the conclusion of closing arguments, J.B. asked, among other things, if he could bring in the therapist and janitor to testify regarding the incidents in which he touched them. The court

31

explained that evidence had closed.  It also denied his request to read a statement.  But J.B. acknowledged that the court had answered his questions.

2. Analysis

The parties dispute whether an NGI defendant has a constitutional or statutory right to self-representation during a recommitment proceeding. We need not decide this issue because, even assuming J.B. had the right to represent himself, we conclude he abandoned his request.

J.B. initially raised the issue by asking, "Is there a way that I can represent myself?" He then said, "*If* I was to represent myself, I would want to do a jury trial." (Italics added.) It was not so much a firm request but a question as to whether it was an option. J.B. then had nearly two weeks to discuss the issue with his attorney and for counsel to research the issue. At the next hearing, J.B. repeatedly stated, including after explanation and discussion with the court, that he wanted a bench trial. Given that he previously had said he only wanted a jury trial if he could represent himself, this reasonably indicates he had decided against representing himself. Moreover, he and his attorney discussed on the record *his attorney* obtaining some of the grievances that formed the basis for his initial interest in representing himself. This indicates he intended to move forward with the help of counsel. Accordingly, we conclude that to the extent J.B.'s statement could be interpreted as request to represent himself, it was equivocal, and he finally abandoned the effort.[13]

---

[13] We also note that the court afforded J.B. ample opportunity to speak to his attorney and the court, as well as ask questions, during the hearing. J.B., notwithstanding his psychiatric challenges, is articulate and appeared to have a high-level of understanding about the proceedings. Had he still wanted to represent himself or been dissatisfied with his counsel's answer as to whether he could, he no doubt would have raised the issue. J.B. likewise

## DISPOSITION

The order extending J.B.'s commitment is affirmed.

RUBIN, J.

WE CONCUR:

DO, Acting P. J.

BUCHANAN, J.

---

testified at trial, in addition to interjecting numerous questions and comments, but never raised the issue of representing himself.